THE FCM GROUP, INC. *v.* JEFFREY
T. MILLER ET AL.
(SC 18074)

Palmer, McLachlan, Eveleigh, Lavine and Beach, Js.

Argued September 23, 2010—officially released May 10, 2011

*Richard C. Robinson,* with whom were *Megan Youngling Carannante* and, on the brief, *Christine Collyer,* for the appellants-cross appellees (defendants).

*Neal L. Moskow,* with whom were *Deborah M. Garskof* and *Anthony J. Labella,* for the appellees-cross appellants (plaintiff and third party defendant Frank C. Mercede III).

*Opinion*

PALMER, J. In this breach of contract and lien foreclosure action arising out of a dispute concerning the construction of a single-family home in the town of Greenwich, the named defendant, Jeffrey T. Miller, who owns the home, and the defendant Cheryl Miller, his

wife,[1] appeal, and the plaintiff, The FCM Group, Inc., the builder of the home, and the third party defendant, Frank C. Mercede III,[2] cross appeal[3] from the judgment of the trial court. The trial court, *Hon. William B. Lewis*, judge trial referee, rendered partial judgment awarding the plaintiff $266,846 in damages, including $3660.67 in lost profit, and awarding the defendants $5000 in damages under General Statutes § 49-8 (c).[4] Thereafter,

[1] We refer to Jeffrey T. Miller and Cheryl Miller collectively as the defendants. We refer to Jeffrey Miller and Cheryl Miller individually by name.

[2] See footnote 7 of this opinion.

[3] The defendants appealed and the plaintiff and the third party defendant, Mercede, cross appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] General Statutes § 49-8 provides: "(a) The mortgagee or a person authorized by law to release the mortgage shall execute and deliver a release to the extent of the satisfaction tendered before or against receipt of the release: (1) Upon the satisfaction of the mortgage; (2) upon a bona fide offer to satisfy the mortgage in accordance with the terms of the mortgage deed upon the execution of a release; (3) when the parties in interest have agreed in writing to a partial release of the mortgage where that part of the property securing the partially satisfied mortgage is sufficiently definite and certain; or (4) when the mortgagor has made a bona fide offer in accordance with the terms of the mortgage deed for such partial satisfaction on the execution of such partial release.

"(b) The plaintiff or the plaintiff's attorney shall execute and deliver a release when an attachment has become of no effect pursuant to section 52-322 or section 52-324 or when a lis pendens or other lien has become of no effect pursuant to section 52-326.

"(c) The mortgagee or plaintiff or the plaintiff's attorney, as the case may be, shall execute and deliver a release within sixty days from the date a written request for a release of such encumbrance (1) was sent to such mortgagee, plaintiff or plaintiff's attorney at the person's last-known address by registered or certified mail, postage prepaid, return receipt requested, or (2) was received by such mortgagee, plaintiff or plaintiff's attorney from a private messenger or courier service or through any means of communication, including electronic communication, reasonably calculated to give the person the written request or a copy of it. The mortgagee or plaintiff shall be liable for damages to any person aggrieved at the rate of two hundred dollars for each week after the expiration of such sixty days up to a maximum of five thousand dollars or in an amount equal to the loss sustained by such aggrieved person as a result of the failure of the mortgagee or plaintiff or the plaintiff's attorney to execute and deliver a release, whichever is greater, plus costs and reasonable attorney's fees."

the trial court, *Karazin, J.*, awarded the plaintiff $64,405.17 in attorney's fees under General Statutes § 52-249 (a)[5] and rendered judgment of strict foreclosure. On appeal, the defendants challenge all aspects of the trial court's judgment in favor of the plaintiff except that portion of the judgment awarding the plaintiff lost profit in the amount of $3660.67. Specifically, the defendants claim that the trial court improperly accepted the recommendations of the attorney trial referee that (1) Cheryl Miller was liable for breach of contract even though she was not a party to the contract, (2) the plaintiff was entitled to delay damages under the terms of the parties' contract, and (3) the plaintiff was entitled to foreclose on a mechanic's lien[6] in the amount of $30,761.98. The defendants further claim that the trial court improperly (1) awarded the plaintiff the remaining balance due under the parties' contract, (2) awarded the plaintiff attorney's fees under § 52-249 (a), and (3) failed to award them attorney's

[5] General Statutes § 52-249 (a) provides: "The plaintiff in any action of foreclosure of a mortgage or lien, upon obtaining judgment of foreclosure, when there has been a hearing as to the form of judgment or the limitation of time for redemption, shall be allowed the same costs, including a reasonable attorney's fee, as if there had been a hearing on an issue of fact. The same costs and fees shall be recoverable as part of the judgment in any action upon a bond which has been substituted for a mechanic's lien."

[6] The plaintiff filed this mechanic's lien pursuant to General Statutes § 49-33, which provides in relevant part: "(a) If any person has a claim for more than ten dollars for materials furnished or services rendered in the construction, raising, removal or repairs of any building or any of its appurtenances or in the improvement of any lot or in the site development or subdivision of any plot of land, and the claim is by virtue of an agreement with or by consent of the owner of the land upon which the building is being erected or has been erected or has been moved, or by consent of the owner of the lot being improved or by consent of the owner of the plot of land being improved or subdivided, or of some person having authority from or rightfully acting for the owner in procuring the labor or materials, the building, with the land on which it stands or the lot or in the event that the materials were furnished or services were rendered in the site development or subdivision of any plot of land, then the plot of land, is subject to the payment of the claim. . . ."

fees under § 49-8 (c) in connection with their successful challenge to a second mechanic's lien in the amount $343,351.47. The plaintiff claims in its cross appeal that the trial court improperly accepted the attorney trial referee's determination that the $343,351.47 mechanic's lien was invalid and, therefore, improperly awarded the defendants $5000 in damages under § 49-8 (c). We agree with the defendants' claims and reject the plaintiff's claims.[7] Accordingly, we reverse in part the judgment of the trial court.

The following facts and procedural history are relevant to our disposition of the defendants' appeal and the plaintiff and Mercede's cross appeal. On June 11, 1998, the plaintiff and Jeffrey Miller entered into a contract for the construction of a 5000 square foot, single-family home on property located at 134 Butternut Hollow Road in Greenwich. Jeffrey Miller was married to Cheryl Miller at the time, but Jeffrey Miller held title to the property in his name alone, and he and the plaintiff were the sole signatories to the construction contract. In addition, by its express terms, the contract binds only the "[o]wner" of the property, who is identified in the contract as Jeffrey Miller.

---

[7] The defendants successfully impleaded Mercede, the president of the plaintiff, as a third party defendant, seeking to pierce the corporate veil and to hold him personally liable for the actions of the plaintiff. The attorney trial referee found that the defendants had proven that the corporate veil should be pierced as to Mercede only with respect to the defendants' successful claim that the plaintiff had filed an invalid mechanic's lien in the amount of $343,351.47. The attorney trial referee recommended that the defendants be awarded $5000 in connection with that claim, and the trial court rendered judgment against Mercede in that amount. Mercede claims that the trial court improperly imposed personal liability on him in connection with the filing of the $343,351.47 mechanic's lien. In their reply brief, however, and again at oral argument before this court, the defendants conceded the validity of Mercede's claim that the attorney trial referee improperly had determined that Mercede was personally liable for the filing of the mechanic's lien. In light of the defendants' concession, we reverse the judgment of the trial court against Mercede in his individual capacity and do not address this issue further.

The plaintiff is a general contractor and builder of residential and commercial properties. Its founder and president, Mercede, an experienced contractor, runs the company's daily operations. Prior to entering into the contract, Mercede and Jeffrey Miller were social acquaintances and previously had worked together on another project. Pursuant to the terms of the contract, Jeffrey Miller agreed to pay the plaintiff $648,394 for the construction of his home, but reserved the right, under article 12 of the contract, to perform a portion of the construction work himself and to hire his own subcontractors to do that work. In a rider attached to the contract, several items, including the garage, the kitchen cabinets and most of the wall coverings and flooring, were expressly excluded from the scope of the work covered by the contract so that Jeffrey Miller could hire his own vendors to install those items. The same rider also provided a "Schedule of Alternates," which permitted the "[o]wner" to "add back in" several of the items that had been excluded from the contract, with a corresponding price for each item.[8] Under article 13 of the contract, the "[o]wner," without invalidating the contract, could order "changes in the [w]ork" con-

---

[8] Rider "A" to the contract provides in relevant part: "SCHEDULE OF ALTERNATES

"1 To add back in the [g]arage and the [b]onus room above (including foundations and slab-on-grade) as originally shown on drawings.

"Please add the sum of Forty Nine Thousand Seven Hundred Eighty Six Dollars ($49,786.00)

"2 To provide front, rear path and rear patio site lighting as shown on drawings.

"Please add the sum of Four Thousand Six Hundred Fifty Dollars ($4,650.00)

"3 To provide driveway lighting with motion sensors as shown on drawings.

"Please add the sum of Five Thousand Two Hundred Eighty Dollars ($5,280.00)

"All of the above alternate prices will only be valid for 30 days after physical mobilization on job site and subject to change by The FCM Group, Inc."

sisting of "additions, deletions or modifications, [with] the [c]ontract [s]um and [c]ontract [t]ime being adjusted accordingly." Such changes had to be authorized by a written change order form signed by the owner, the contractor and the architect.

Pursuant to article 2, the contract was to commence "[u]pon issuance of a [b]uilding [p]ermit," and the plaintiff was to achieve "[s]ubstantial [c]ompletion of the entire [w]ork not later than . . . 240 [c]alendar [d]ays from the commencement of work," subject to any time adjustments as provided under the contract. Although it was the responsibility of the plaintiff to secure all building permits, Jeffrey Miller was required to furnish all other "approvals," including wetlands approval. On June 18, 1998, the plaintiff applied to the town of Greenwich (town) for a building permit, but the application was denied due to certain unresolved wetlands issues. The town, however, eventually issued the wetlands approval on September 2, 1998, and the town also issued the foundation permit on October 6, 1998.

The defendants had agreed that Cheryl Miller could communicate directly with Mercede about any changes to the design of the house, or any problems with the project. From June, 1998, through December, 1999, she visited the property two to three times a week and requested numerous changes. As a general matter, Cheryl Miller would request a change on behalf of Jeffrey Miller, and the plaintiff would quote a price for the change. The defendants then would decide whether to proceed with the change depending on the price. As of November 10, 1999, the parties had agreed to four written change orders, which included a total of 113 changes to the contract.[9] These changes had increased the con-

---

[9] On December 30, 1998, the plaintiff sent Jeffrey Miller the first of the four change order forms, which detailed the changes that had been requested to date and the price for each change. The changes ranged from the very simple, such as adding a light switch in the mudroom for $100, to the very expensive, such as adding a garage and bonus room for $49,786. At the end

tract price to $803,090.98, and had added a total of eighty-six business days to the schedule. Several of the changes constituted credits to Jeffrey Miller for items that the parties had agreed to subtract from the contract.

Article 4 of the contract provided for "progress payments" to be made by the "[o]wner" on the basis of the applications for payment submitted by the "[c]ontractor" and approved by the architect. Article 5 provided that "[f]inal payment" was due when all of the work had been completed, the contract had been "fully performed," and a final certificate for payment had been issued by the architect. As of December 8, 1999, Jeffrey Miller had made nine progress payments to the plaintiff for a total of $778,638, which constituted approximately 97 percent of the total revised contract price of $803,090.98. By the end of January, 2000, the project was approximately 95 percent complete, and the only payment remaining was the final payment of $24,452.98, which was due upon completion of all work.

By that time, however, the parties' relationship had become strained. Although dissatisfaction had been building steadily for some time on both sides, the relationship broke down irretrievably when, on or about February 2, 2000, Mercede and Cheryl Miller got into a dispute over when and how the contractor's "final punch list," that is, the list of items that the contractor was required to complete or repair before final payment was due, should be handled. Mercede informed Cheryl Miller that it was customary to compile a master punch list during a final walk through of the premises with the architect and owner, rather than to submit partial punch lists in piecemeal fashion. Specifically, Mercede

---

of the form, the plaintiff stated: "These changes will add an additional (16) calendar days to the schedule. None of these changes in the work will commence until this executed change order is received by our firm." Jeffrey Miller signed the form on January 8, 1999, and returned it to the plaintiff.

told her that his "intention was to get everything on one list, complete my work and get my final payments." Cheryl Miller responded that Mercede would "never see [his] final payment." Following his encounter with Cheryl Miller, on February 7, 2000, Mercede wrote a letter to Jeffrey Miller in which he demanded payment of $30,761.98 on or before February 16, 2000. Although the balance remaining on the signed contract was $24,452.98, he attached to the letter a "final change order for the project," which increased the contract price by $6309, for a total contract price of $809,399.98. The letter also noted the addition of sixty-seven business days to the construction schedule,[10] for a total of 153 business days by which the original schedule had been extended as a result of all of the change orders. Jeffrey Miller was instructed to execute the new change order and to return it to the plaintiff, together with the final payment, in return for the plaintiff's agreement not to file a mechanic's lien or to bring an action for delays in the project. Jeffrey Miller never signed this final change order.[11]

On February 10, 2000, Jeffrey Miller responded to Mercede's letter by informing Mercede that, consistent with the terms of their agreement, he expected the plaintiff to complete all work before he would remit final payment. With respect to Mercede's demand that Jeffrey Miller execute the final change order form and

---

[10] This was in addition to the eighty-six business days that were noted in the previous change order.

[11] Mercede testified that he demanded final payment after his conversation with Cheryl Miller because he "was concerned that [he] was never going to get the final payment, that [the defendants] were just going to keep coming up with all sorts of little . . . things and [he] was never going to get the final payment, after two years, too, of being tortured, and then [he] wasn't going to get [his] final payment. So [he] got concerned and [he] wrote [Jeffrey Miller] a letter saying that in exchange for all the stuff that went on here, all the delays and all the problems, [he would] not make an issue out of that, but [he] want[ed] [his] final payment and [would] complete the work after getting [it]."

return it to Mercede by February 16, 2000, Jeffrey Miller stated: "As always you will receive [an] executed change order in a timely manner, however, I have just received [this] change order and need time to review [the] final accounting and credits due [to the] owner." As the attorney trial referee found, "a series of incidents [occurred thereafter] that do not reflect well on either side." Specifically, on or about February 10, 2000, the plaintiff had a large storage container delivered to the property and placed at the end of the driveway, blocking vehicular access to the house. The plaintiff also changed the lock on the construction fence surrounding the property, apparently for the purpose of preventing the defendants from gaining access to the site.

On February 11, 2000, Jeffrey Miller's attorney sent the plaintiff and Mercede a letter that provided in relevant part: "On February 11, 2000, [Jeffrey] Miller was locked out of 134 Butternut Hollow Road when you and your agents . . . changed the locks on [his] $2,000,000 home. In my opinion, your actions constitute a 'lock out' according to [the] Connecticut General Statutes.

"In addition, [Jeffrey] Miller's house is now blocked by a dumpster . . . . This is a civil trespass. Access and egress are impossible. . . . Upon consultation with the owner of the dumpster . . . I have learned that you have leased this dumpster. You intentionally placed the dumpster in the way to block [Jeffrey] Miller from his home and to defeat any chance of gaining access to the premises. Apparently, these events were triggered by [Jeffrey] Miller's letter to you dated February 10, 2000, reminding you of your contractual obligations for the construction of [Jeffrey] Miller's home pursuant to your contract dated June [11], 1998." The letter further provided that the contract required Mercede "to 'perform a "walk through" when all work has been completed. A punch list is to be compiled of any

items uncompleted or in need of correction.' Your contract states: 'When these items have been completed any balance of payment for the total job including change orders will be remitted to the contractor in full.' Now, you are trying to contravene the very same contract you prepared by insisting [on] payment in full before completion of the work." The letter concluded by providing that Mercede was "in default of [the] contract" and suggesting that Jeffrey Miller was exercising his right to terminate the contract.[12] The letter advised Mercede that, if he returned to the property, he would be trespassing and that Jeffrey Miller "[would] be compelled to seek the intervention of the police."

On February 11, 2000, Cheryl Miller yelled expletives at Mercede while he was at the property and ordered him to leave the premises. On or about February 14, 2000, an obscenity directed at Mercede was painted on the side of the storage container that Mercede had placed at the entrance to the driveway. On February 15, 2000, the plaintiff's attorney wrote a letter to Jeffrey Miller's attorney stating that, contrary to Jeffrey Miller's claims, the plaintiff did not change the locks on the house but, rather, had changed the padlock on the construction fence, which it had a contractual right to do. The letter further provided that the storage container

---

[12] Article 20 of the contract provides in relevant part: "20.2 If the [c]ontractor defaults or persistently fails or neglects to carry out the [w]ork in accordance with the [c]ontract [d]ocuments or fails to perform a provision of the [c]ontract, the [o]wner, after seven days' written notice to the [c]ontractor and without prejudice to any other remedy the [o]wner may have, may make good such deficiencies and may deduct the cost thereof, including compensation for the [a]rchitect's services and expenses made necessary thereby, from the payment then or thereafter due the [c]ontractor. Alternatively, at the [o]wner's option, and upon certification by the [a]rchitect that sufficient cause exists to justify such action, the [o]wner may terminate the [c]ontract and take possession of the site and of all materials, equipment, tools, and construction equipment and machinery thereon owned by the [c]ontractor and may finish the [w]ork by whatever method the [o]wner may deem expedient. . . ."

at the foot of the driveway was not intended to impede access to the construction site but had been placed there because it was the only level surface on the property that could accommodate it. Finally, the letter asserted that Jeffrey Miller's purported termination of the contract was invalid under article 20 of the contract; see footnote 12 of this opinion; and that the plaintiff had suffered considerable delay damages as a result of the defendants' interference with the project. The letter concluded: "Notwithstanding the foregoing, the project has been ongoing for [twenty-two] months and is now essentially complete. It seems ridiculous to use all of the artillery that we can muster, which we both know is formidable, instead of sitting down and resolving this matter. . . . My client and I are ready to work with you to address the [defendants'] concerns and [to] resolve [the plaintiff's] claims."

Notwithstanding the conciliatory tone of this letter, the next day, the plaintiff obtained and subsequently filed[13] two mechanic's liens on the property, one in the amount of $30,761.98, which corresponded to the alleged balance due under the contract as specified in the unsigned final change order, and the other in the amount of $343,351.47, which, according to the plaintiff, represented delay damages that it had incurred over the course of the construction project. On February 28, 2000, Jeffrey Miller served Mercede and the plaintiff with a demand for release of the two mechanic's liens, claiming that those liens were invalid because, inter alia, the sums alleged therein did not constitute lienable sums insofar as they did not represent amounts due for any materials furnished or services rendered by the plaintiff for which it had not already been paid.

On April 20, 2000, the plaintiff brought this action against the defendants to foreclose on the two mechan-

---

[13] The liens were recorded on February 25, 2000.

ic's liens and for breach of contract.[14] The defendants filed an answer, six special defenses and a six count counterclaim, alleging, inter alia, breach of contract, violation of the Home Improvement Act, General Statutes § 20-418 et seq., and violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. The defendants also alleged that the two mechanic's liens were invalid and that the plaintiff had violated General Statutes §§ 49-8 and 49-13[15] by refusing to release them. The plaintiff and the defendants sought damages, costs and attorney's fees in connection with their respective claims. The defendants also filed a third party complaint against Mercede.[16]

The case was referred to attorney trial referee Alfred H. Hoddinott, Jr. After eight days of hearings, the parties submitted posttrial briefs. The plaintiff and Mercede

[14] The plaintiff also alleged unjust enrichment but subsequently abandoned that claim.

[15] General Statutes § 49-13 provides in relevant part: "(a) When the record title to real property is encumbered (1) by any undischarged mortgage, and . . . (D) the note or evidence of indebtedness has been paid or a bona fide offer and tender of the payment has been made pursuant to section 49-8, or (E) the mortgage has become invalid, and in any of such cases no release of the encumbrance to secure such note or evidence of indebtedness has been given, or (2) by a foreclosed mortgage and the mortgagor has made a bona fide offer and tender of payment of the foreclosure judgment on or before the mortgagor's law day and the mortgagee has refused to accept payment, or (3) by an attachment, lis pendens or other lien which has become of no effect, the person owning the property, or the equity in the property, may bring a petition to the superior court for the judicial district in which the property is situated, setting forth the facts and claiming a judgment as provided in this section. The plaintiff may also claim in the petition damages as set forth in section 49-8 if the plaintiff is aggrieved by the failure of the defendant to execute the release prescribed in said section. . . ."

[16] In the defendants' third party complaint against Mercede in his individual capacity, Cheryl Miller alleged that Mercede frivolously had caused her to be named as a defendant in the action in view of the fact that she was not a signatory to the construction contract or the owner of the subject property. The attorney trial referee found in favor of Mercede on this claim, and the trial court accepted that finding and rendered judgment in accordance therewith. Cheryl Miller has not appealed from that portion of the judgment.

claimed in their brief that the evidence established that the defendants had caused the project to be delayed a total of "406 calendar days . . . including 120 days associated with the failure to obtain wetlands [approval], 210 days . . . directly linked to the 140 plus [change orders] and 76 days attributable to interference . . . by contractors . . . engaged by the [defendants]." The plaintiff and Mercede further asserted that "[t]he total delay damages attributable to the changes in the [w]ork, interference by the [defendants] and delays for which the [defendants] are responsible total $255,720.07 . . . ." The plaintiff and Mercede also contended that the plaintiff was entitled to the $30,761.98 balance remaining on the contract, as specified in the unsigned final change order, as well as attorney's fees. Finally, the plaintiff and Mercede claimed that Cheryl Miller properly had been named as a defendant in the action and that she should be held liable for breach of contract because she was a "[b]eneficial and [e]quitable [o]wner" of the property.

The defendants asserted in their brief that both mechanic's liens were invalid because the plaintiff had failed to identify the materials that it had furnished or the services that it had rendered, in accordance with General Statutes § 49-33. See footnote 6 of this opinion. The defendants further observed that Mercede had testified that all of his records pertaining to the construction of Jeffrey Miller's home were damaged or destroyed in an office accident and, therefore, that he had been unable to establish the value of the services and materials allegedly furnished in connection with the contract balance. The defendants also maintained that the plaintiff was not entitled to delay costs stemming from the change orders because those costs necessarily were or should have been included in the price of the change orders. Finally, the defendants claimed that the plaintiff and Mercede's contention that Cheryl Miller should be

held liable for breach of contract on the basis of her beneficial and equitable ownership of the property was "utterly baseless."

Thereafter, the attorney trial referee issued a report[17] in which he found that Cheryl Miller anticipatorily had breached the construction contract when she told Mercede, in February, 2000, that the defendants "would not pay anything further" under the contract. He further found that the February 11, 2000 letter that Jeffrey Miller's attorney had sent to the plaintiff and Mercede, which "purported to be a more formal termination of the contract," did not comply with the termination provisions of article 20 of the contract and, therefore, constituted a breach by the defendants. Finally, the attorney trial referee rejected Cheryl Miller's claim that the plaintiff improperly had named her as a defendant in the action, adopting the plaintiff's contention that, although she did not hold title to the property and had not signed the construction contract, she "clearly . . . [was] an equitable owner of the premises," and "Connecticut courts . . . repeatedly [have] recognized 'equitable or beneficial' ownership in real property, particularly in the summary process and mechanic's lien contexts."

Having concluded that the defendants breached the construction contract, the attorney trial referee turned next to the issue of the plaintiff's damages, noting that the plaintiff bore the burden of proof on this issue. He then observed that article 12 of the contract permitted the recovery of "[c]osts caused by delays," and found that the plaintiff had proven that the defendants were responsible for a total of "228 delay days," 75 delay days occasioned by Jeffrey Miller's delay in obtaining wetlands approval and 153 days relating to the various

---

[17] The attorney trial referee issued a report and a supplemental report in response to certain of the parties' objections to the initial report. In the interest of simplicity, we treat these two reports as one report in discussing the attorney trial referee's findings and recommendations.

change orders. The attorney trial referee, however, rejected the plaintiff's claim for 76 delay days stemming from Jeffrey Miller's use of his own subcontractors, concluding that the plaintiff had adduced no evidence that such delays had occurred. Rather than attempt to estimate the " '[c]osts [to the plaintiff] caused by delays,' " the attorney trial referee instead calculated damages for the plaintiff in terms of "lost profit . . . ." Specifically, he observed that, "in 2000, the year of the breach, [the plaintiff] reported profits of $372,087 on income of $3,119,535, for a profit margin of 11.9 percent. Put another way, it had a profit of $1019.41 for each calendar day in the year 2000." He determined that, "[a]llowing $1019.41 [in] lost profit for each delay day, [the] plaintiff [was] entitled to $232,425.48 for damages occasioned by delays." Because, however, the plaintiff failed to adduce any evidence that it had provided services or materials in connection with the $30,761.98 balance allegedly remaining on the contract, as specified in the unsigned final change order, the attorney trial referee did not recommend awarding the plaintiff that amount. He did, however, recommend an award for the profit that he determined the plaintiff would have earned on that amount, namely, $3660.67, which he calculated by multiplying $30,761.98 by 11.9 percent. This resulted in a total recommended award for the plaintiff of $236,086.15.

With respect to the $343,351.47 mechanic's lien, the attorney trial referee rejected the defendants' claim that delay damages cannot be the subject of a lien filed pursuant to § 49-33 and that the lien was invalid for that reason. He determined, however, that the lien was invalid under § 49-36[18] because it exceeded the total

[18] General Statutes § 49-36 provides in relevant part: "(a) No mechanic's lien may attach to any building or its appurtenances, or to the land on which the same stands, or any lot, or any plot of land, in favor of any person, to a greater amount in the whole than the price which the owner agreed to pay for the building and its appurtenances or the development of any such lot, or the development of any such plot of land. . . ."

amount of the balance due under the contract. Having determined that the defendants had proven the invalidity of the $343,351.47 lien, the attorney trial referee also determined that the defendants were entitled to $5000 in damages under § 49-8 (c). The attorney trial referee observed, however, that he was not authorized to recommend an award of attorney's fees, which, like damages, also are mandated under § 49-8 (c) and, therefore, left that determination to the trial court. Finally, the attorney trial referee recommended foreclosure of the $30,761.98 mechanic's lien securing the contract balance.[19] With respect to the issue of the plaintiff's attorney's fees, which are authorized by § 52-249 (a),[20] the attorney trial referee left that matter for determination by the court, *Karazin, J.*, which subsequently awarded the plaintiff $64,405.17 in such fees.[21]

Both sides filed objections to the attorney trial referee's report. The defendants contended, inter alia, that the attorney trial referee's finding that they had breached the parties' contract and were liable for delay damages and lost profit on the unpaid contract balance was legally and factually unsupportable and predicated on a fundamental misapprehension of the parties' contract. They claimed that, because Cheryl Miller was not a party to the contract, her statements to Mercede could not support a finding of anticipatory breach of contract. The defendants observed that Jeffrey Miller had repudiated Cheryl Miller's statements through his attorney's

---

[19] The attorney trial referee offered no explanation for his recommendation that the $30,761.98 mechanic's lien should be foreclosed even though he had found that the plaintiff had not proven that it had provided any materials or services in connection with the project, in accordance with § 49-33.

[20] See footnote 5 of this opinion.

[21] The attorney trial referee recommended that all of the defendants' remaining claims against the plaintiff be rejected, and the court, *Hon. William B. Lewis*, judge trial referee, subsequently adopted that recommendation. The defendants have not challenged the court's adoption of that recommendation on appeal.

February 11, 2000 letter to Mercede, in which the attorney reminded Mercede of the parties' respective contractual obligations. The defendants also maintained that the plaintiff had breached the contract on February 7, 2000, by demanding payment in full before it was due. In addition, the defendants contended that any delay costs occasioned by Jeffrey Miller's failure to obtain wetlands approval were not a basis for recovery under the terms of the contract. Finally, the defendants contended that the mechanic's lien statutory scheme was not intended to provide security for a contractor's lost profit, and, consequently, to the extent that the attorney trial referee had recommended foreclosure of one of the mechanic's liens as a means of securing payment for the plaintiff's lost profit, that recommendation was improper. The plaintiff and Mercede objected to the attorney trial referee's computation of delay damages, the finding that the mechanic's lien in the amount of $343,351.47 was invalid under § 49-36 because it exceeded the balance due under the contract and the recommendation to award the defendants $5000 in damages under § 49-8 (c).

The trial court, *Hon. William B. Lewis*, judge trial referee,[22] issued a memorandum of decision accepting all of the attorney trial referee's findings and awarded the plaintiff $266,846 less the $5000 award for the defendants under § 49-8 (c). Specifically, the court stated: "Based on the appropriate standard of review outlined [in the memorandum of decision], the [attorney trial] referee's report and recommendations are accepted. No material error in the [attorney trial] referee's report has been found, and there is no other sufficient reason for rendering the report unacceptable." The court further stated: "The attorney trial referee recommended a total judgment for [the plaintiff] in the amount of $266,846

---

[22] References hereinafter to the trial court are to Judge Lewis unless otherwise indicated.

and judgment for the defendants in the amount of $5000," explaining that the award consisted of the "$30,761 balance due on the contract, $232,425 for delay damages, and $3660 for loss of profit." The court also found in favor of the plaintiff on the $30,761.98 mechanic's lien, stating that the "case should now be claimed for the foreclosure calendar in order to determine the type and date of foreclosure, value of the premises, and other details, including the matter of attorney's fees."

The defendants filed motions for reargument, articulation, and to set aside or to open the judgment. In these motions, the defendants attempted to draw the trial court's attention to a myriad of alleged legal and factual errors in the attorney trial referee's report that the trial court had accepted. In particular, the defendants noted that, although the attorney trial referee had recommended that the trial court award the plaintiff the sum of $236,086.15, the court had awarded the plaintiff $266,846, apparently in the belief that the attorney trial referee had intended to award the plaintiff the $30,761.98 balance remaining on the contract, in addition to $236,086.15. The defendants also noted that, although the attorney trial referee had recommended that they be awarded attorney's fees in connection with their successful challenge to the invalid $343,351.47 mechanic's lien, the trial court failed to award them any such fees. Finally, they claimed that the plaintiff was not entitled to recover delay costs in connection with the change orders or in connection with the time that it took to obtain the required building permits, the issuance of which depended on the town's wetlands approval. With respect to the change order delays, the defendants maintained that all costs associated with the change orders necessarily were included in the price of those orders. With respect to the issue of building permits, they asserted that the delay in the issuance of any required permit was not a delay within the meaning

of the contract because, among other reasons, the time periods provided for in the contract did not begin to run until after those permits had been issued. The trial court denied all of the defendants' motions without explanation. Additional facts and procedural history will be set forth as necessary.

I

We first address the defendants' claim that the trial court improperly accepted the attorney trial referee's finding that Cheryl Miller was liable for breach of contract, which was based on her alleged equitable or beneficial ownership of the property. In accepting that finding, the trial court stated: "In terms of Cheryl Miller's liability, the attorney trial referee summed up his factual findings by stating that she was 'intimately involved in the project, and a major cause of the problems.' The [attorney trial] referee described her as a beneficial owner of the subject premises . . . and hence liable to the plaintiff to respond in damages. Again, there is nothing unreasonable or illogical about this factual finding . . . ." We agree with the defendants that the trial court improperly accepted the attorney trial referee's finding on this issue.

We begin by setting forth the applicable standard of review. "[Although] the reports of [attorney trial referees] . . . are essentially of an advisory nature, it has not been the practice to disturb their findings when they are properly based [on] evidence, in the absence of errors of law, and the parties have no right to demand that the court . . . redetermine the fact[s] thus found. . . .

"A reviewing authority may not substitute its findings for those of the trier of the facts. This principle applies no matter whether the reviewing authority is the Supreme Court . . . the Appellate Court . . . or the Superior Court reviewing the findings of . . . attorney

trial referees. . . . This court has articulated that attorney trial referees and factfinders share the same function . . . whose determination of the facts is reviewable in accordance with well established procedures prior to the rendition of judgment by the court. . . .

"Although it is true that when the trial court reviews the attorney trial referee's report the trial court may not retry the case and pass on the credibility of the witnesses, the trial court must review the referee's entire report to determine whether the recommendations contained in it are supported by findings of fact in the report. . . .

"Finally . . . because the attorney trial referee does not have the powers of a court and is simply a fact finder, [a]ny legal [determinations] reached by an attorney trial referee have no conclusive effect. . . . The reviewing court is the effective arbiter of the law and the legal opinions of [an attorney trial referee], like those of the parties, though they may be helpful, carry no weight not justified by their soundness as viewed by the court that renders judgment. . . . [When] legal [determinations] are challenged, [this court] must determine whether they are legally and logically correct and whether they find support in the facts found by the . . . referee." (Citations omitted; internal quotation marks omitted.) *Alliance Partners, Inc.* v. *Oxford Health Plans, Inc.*, 263 Conn. 191, 201–202, 819 A.2d 227 (2003).

The attorney trial referee determined that, even though Cheryl Miller was not a party to the contract between Jeffrey Miller and the plaintiff and did not hold title to the property, she nevertheless could be held liable for breach of that contract on the basis of principles of "equitable" or "beneficial" ownership. The attorney trial referee apparently based this determination on his findings that Cheryl Miller had "exercised virtually complete dominion and control over" the property and

"virtually everything happened there at her instigation, and virtually nothing [happened] without her concurrence." Although the attorney trial referee did not elaborate further on his reasons for holding Cheryl Miller liable under the contract, he relied on two cases, namely, *Centerbrook, Architects & Planners* v. *Laurel Nursing Services, Inc.*, 224 Conn. 580, 620 A.2d 127 (1993) (*Centerbrook*), and *Sekeret* v. *Zdanis*, Superior Court, judicial district of Litchfield, Housing Session, Docket No. CV-187692 (April 19, 2001), in which this court and the Superior Court, respectively, had applied the concept of beneficial or equitable ownership, albeit in contexts unrelated to the facts of the present case. We agree with the defendants that neither *Centerbrook* nor *Sekeret* supports the attorney trial referee's finding that Cheryl Miller is liable for breach of a contract to which she was not a party.

Before turning to those cases, however, we set forth a general principle so fundamental that it rarely receives mention in case law or commentary, namely, that only parties to contracts are liable for their breach. "[T]he obligation of contracts is limited to the parties making them, and, ordinarily, only those who are parties to contracts are liable for their breach. Parties to a contract cannot thereby impose any liability on one who, under its terms, is a stranger to the contract, and, in any event, in order to bind a third person contractually, an expression of assent by such person is necessary." (Internal quotation marks omitted.) *Gambles* v. *Perdue*, 175 Mont. 112, 115, 572 P.2d 1241 (1977). In other words, "[a] person who is not a party to a contract (i.e., is not named in the contract and has not executed it) is not bound by its terms." (Internal quotation marks omitted.) *Plaza Properties, Ltd.* v. *Prime Business Investments, Inc.*, 240 Ga. App. 639, 642, 524 S.E.2d 306 (1999), aff'd, 273 Ga. 97, 538 S.E.2d 51 (2000); see also *Equal Employment Opportunity Commission* v. *Waffle House, Inc.*,

534 U.S. 279, 294, 122 S. Ct. 754, 151 L. Ed. 2d 755 (2002) ("[i]t goes without saying that a contract cannot bind a nonparty"); *Kahn* v. *Prahl*, 414 S.W.2d 269, 278 (Mo. 1967) ("one not a party to a contract is not bound thereby and is not liable for breach of a contract to which he is not a party"); *Gambles* v. *Perdue*, supra, 115 ("[i]t is elementary law that a contract binds no one but the contracting parties" [internal quotation marks omitted]). Thus, "[a]s a general rule, [an action] for breach of contract may not be maintained against a person who is not a party to the contract . . . ." *Bernard Johnson, Inc.* v. *Continental Constructors, Inc.*, 630 S.W.2d 365, 369 (Tex. App. 1982, writ ref'd n.r.e.); see also *Wallace ex rel. Cencom Cable Income Partners II, L.P.* v. *Wood*, 752 A.2d 1175, 1180 (Del. Ch. 1999) ("[i]t is a general principle of contract law that only a party to a contract may be sued for breach of that contract"); cf. *American Express Centurion Bank* v. *Head*, 115 Conn. App. 10, 15–16, 971 A.2d 90 (2009) ("[t]he elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages" [internal quotation marks omitted]). Contrary to the finding of the attorney trial referee and the conclusion of the trial court, the plaintiff and Mercede have failed to establish that this general rule is inapplicable to the present case. In other words, the plaintiff and Mercede have not demonstrated that this case falls within any recognized exception to the principle that a contract is binding only on those who are parties to it.

As we noted previously, the only precedents on which the attorney trial referee relied are *Centerbrook, Architects & Planners* v. *Laurel Nursing Services, Inc.*, supra, 224 Conn. 580, and *Sekeret* v. *Zdanis*, supra, Superior Court, Docket No. CV-187692. In *Centerbrook*, this court recognized that, under certain limited circum-

stances, a person who enters into a contract to purchase real property and is authorized by the seller or purchase agreement to make improvements to the property before the closing date, may, before legal title passes, acquire an equitable interest in the property "sufficient to be considered an owner for purposes of [§ 49-33] the mechanic's lien statute." (Internal quotation marks omitted.) *Centerbrook, Architects & Planners* v. *Laurel Nursing Services, Inc.*, supra, 584; see also id., 584–89. Under such circumstances, if a mechanic's lien is filed in connection with the improvements that the buyer was authorized to make prior to the purchase date, then the seller—who was the record owner at the time of the improvements—will be deemed to have consented to those improvements for purposes of the requirements of § 49-33. See id., 588–89. In so concluding, we relied on the settled principle that, "[u]nder the doctrine of equitable conversion a contract for the sale of land vests equitable title in the vendee." *Lanna* v. *Greene*, 175 Conn. 453, 461, 399 A.2d 837 (1978); see *Centerbrook, Architects & Planners* v. *Laurel Nursing Services, Inc.*, supra, 587–89. We cannot perceive, however, and the plaintiff and Mercede do not explain, what possible bearing *Centerbrook* has on the issue of whether Cheryl Miller properly may be held liable for breaching a contract to which she was not a party.

In *Sekeret*, the other case on which the attorney trial referee relied, the trial court recognized that, if a person has been found to be a beneficial owner of real property pursuant to the terms of a trust instrument, he is not a "tenant" of the property for purposes of summary process but, instead, is an "owner" and, therefore, not subject to eviction. See *Sekeret* v. *Zdanis*, supra, Superior Court, Docket No. CV-187692. In the present case, however, there is no claim that Cheryl Miller was a

beneficial owner of the property pursuant to a trust agreement. Even if she were such an owner, however, we are aware of no authority, and the plaintiff and Mercede have cited none, for the proposition that her beneficial or equitable ownership interest, without more, would obligate her under the terms of the contract between the plaintiff and Jeffrey Miller.[23]

As we explained, the contract refers throughout to the "[o]wner," who is expressly identified therein as Jeffrey Miller. Furthermore, nothing in the contract purports to bind Cheryl Miller, who is neither a signatory to the contract nor a title holder to the property.[24]

[23] Despite the general rule that only parties to a contract are bound by its terms, courts have held that a person who is not a signatory to a contract nevertheless may be liable under the contract if that person accepts or adopts the contract. See, e.g., *White* v. *National Football League*, 92 F. Sup. 2d 918, 923 (D. Minn. 2000); *Central of Georgia Railway Co.* v. *Woolfolk Chemical Works, Ltd.*, 122 Ga. App. 789, 792, 178 S.E.2d 710 (1970); *Porter* v. *General Boiler Casing Co.*, 284 Md. 402, 409–10, 396 A.2d 1090 (1979). The plaintiff and Mercede never have claimed, however, that Cheryl Miller is liable under this theory, and, consequently, the attorney trial referee never considered it.

[24] We note that the plaintiff and Mercede never have claimed an agency relationship between Cheryl Miller and Jeffrey Miller. Even if such a relationship had been alleged and found to exist, however, it would not have supported an action against Cheryl Miller for breach of contract. See, e.g., *Whitlock's, Inc.* v. *Manley*, 123 Conn. 434, 437, 196 A. 149 (1937) ("[i]f a contract is made with a known agent acting within the scope of his authority for a disclosed principal, the contract is that of the principal alone, unless credit has been given expressly and exclusively to the agent, and it appears that it was clearly his intention to assume the obligation as a personal liability" [internal quotation marks omitted]); *Anderson* v. *Gordon, Muir & Foley, LLP*, 108 Conn. App. 410, 418, 949 A.2d 488 ("[I]t is a general rule of agency law that the [principal] in an agency relationship is bound by, and liable for, the acts in which his agent engages with authority from the principal, and within the scope of the agent's employment. . . . [W]e are aware of [no authority] in support of [the] proposition that an agent is bound by, and liable for, a principal's independent actions." [Citation omitted; internal quotation marks omitted.]), cert. denied, 289 Conn. 927, 958 A.2d 156 (2008). Moreover, to the extent that Cheryl Miller's actions may be attributable to Jeffrey Miller, those actions provide no basis for binding Cheryl Miller to the terms of a contract to which she is not a party.

Indeed, the contract contains no reference to Cheryl Miller. Because the plaintiff and Mercede have offered no legal support for the attorney trial referee's finding that Cheryl Miller is liable for breaching the contract between Jeffrey Miller and the plaintiff,[25] that portion of the trial court's judgment that was rendered against her cannot stand.[26]

---

[25] As we previously noted, the attorney trial referee placed the bulk of the responsibility for breaching the contract between the plaintiff and Jeffrey Miller on Cheryl Miller, finding that she anticipatorily had breached the contract by telling Mercede that he would not receive his final payment. Because the attorney trial referee improperly treated Cheryl Miller as a party to the contract, and because the plaintiff did not claim an agency relationship between Cheryl Miller and Jeffrey Miller; see footnote 24 of this opinion; all of the conclusions that are dependent on or that flowed from that finding necessarily are suspect. Jeffrey Miller has elected not to challenge any of the attorney trial referee's factual findings, however, because, he contends, the plaintiff's award of attorney's fees, the trial court's failure to act on his request for attorney's fees, and all but $3660.67 of the $266,846 damages awarded against him, are improper as a matter of law. Furthermore, if proven, these claims would eliminate the need for a retrial on any of the plaintiff's claims. For the reasons set forth hereinafter, we agree with Jeffrey Miller's claims.

[26] In addition to *Centerbrook* and *Sekeret*, the plaintiff and Mercede offer *Hope* v. *Cavallo*, 163 Conn. 576, 316 A.2d 407 (1972), and *Mozeleski* v. *Thomas*, 76 Conn. App. 287, 818 A.2d 893, cert. denied, 264 Conn. 904, 823 A.2d 1221 (2003), as support for their contention that the attorney trial referee and the trial court properly determined that Cheryl Miller was a beneficial owner of the property and bound by the terms of the construction contract. Contrary to the plaintiff and Mercede's assertion, these cases provide no support for their claim. In *Hope*, this court construed the term " 'owned' " for purposes of General Statutes § 52-556, which provides injured motorists with a right of action against the state for injuries caused by a state employee's negligent operation of a motor vehicle owned by the state, and concluded that the term was broad enough to include a vehicle that had been loaned to the state by the federal government. *Hope* v. *Cavallo*, supra, 579–86. In *Mozeleski*, the Appellate Court determined that an owner of property was not liable for injuries to an independent contractor working on the property because it was undisputed that the owner had not exercised control over the area where the independent contractor was working. *Mozeleski* v. *Thomas*, supra, 292–94. It is apparent that neither *Hope* nor *Mozeleski* sheds any light on the issue of whether a person who is not a party to a construction contract may be bound by the contract terms merely because that person has reason to be interested in the property that is the subject of the contract.

II

We next consider Jeffrey Miller's claim[27] that the trial court improperly awarded the plaintiff the balance allegedly due under the contract as of February 7, 2000,[28] despite the contrary recommendation of the attorney trial referee. Jeffrey Miller contends that the $30,761.98 award contravenes the well established principle that the injured party in an action for the breach of a construction contract may not recover damages in excess of his or her actual losses or for work never performed. In support of this claim, Jeffrey Miller notes that the attorney trial referee found that, at the time of the defendants' purported breach of contract, the plaintiff had been paid $778,638, or 96 percent of the total revised contract price of $809,399.98, but that the plaintiff had completed only 95 percent of the work, leaving a small credit owing to Jeffrey Miller. Jeffrey Miller further contends that, because the plaintiff failed to demonstrate that it was owed any part of the contract balance at the time of the breach, the portion of the award accounting for the difference between $809,399.98, the total revised contract price, and $778,638, the total amount of payments that Jeffrey Miller had remitted to the plaintiff, or $30,761.98, must be vacated, and, in addition, the judgment of foreclosure must be reversed. Finally, Jeffrey Miller maintains that, because the $30,761.98 mechanic's lien was invalid, the plaintiff's award of attorney's fees in the amount of $64,405.17

---

[27] Although Cheryl Miller also raises this and other claims along with Jeffrey Miller, in view of our decision that the trial court improperly treated Cheryl Miller as a party to the contract, the trial court's judgment must be reversed insofar as Cheryl Miller either is liable under the judgment or entitled to damages thereunder. Because she is not a party and, therefore, not liable to the plaintiff, we have no reason to consider any of her other claims. Consequently, in addressing all other remaining claims, we hereinafter refer to Jeffrey Miller only unless the context requires otherwise.

[28] As we previously noted, the attorney trial referee identified February 7, 2000, as the date on which the defendants had breached the contract.

under § 52-249 (a) also must be reversed. We agree with each of these claims.

The following additional facts and procedural history are relevant to our disposition of the issues presented by Jeffrey Miller's claims. The plaintiff sought to establish that it was owed a portion of the balance remaining on the contract. To that end, the plaintiff introduced a copy of a cancelled check in the amount of $4000, which Mercede testified had gone toward the purchase of a shower stall for Jeffrey Miller's home that never was installed. Mercede further testified that, after the defendants had breached the contract, he attempted to sell the shower stall but was unsuccessful. Jeffrey Miller's attorney objected to this evidence on the ground that its admission would violate a prior court order precluding the plaintiff from introducing any evidence that it improperly had failed to turn over to Jeffrey Miller's attorney during discovery, including all business records, invoices and receipts relating to the construction of Jeffrey Miller's home. The attorney trial referee sustained the objection, concluding that the proffered evidence fell squarely within the purview of the court's order. The plaintiff did not seek to present any additional evidence establishing the balance that it claimed to be owed under the contract.

Thereafter, the attorney trial referee recommended a total damages award for the plaintiff in the amount of $236,086.15, which included delay damages as well as the plaintiff's lost profit on the contract balance. The award did not include the contract balance itself, however, apparently because the plaintiff had failed to prove that it was owed any portion of that balance. Notwithstanding the attorney trial referee's findings and recommendation, the trial court awarded the plaintiff the contract balance, calculated at $30,761.98. The trial court, *Karazin, J.*, rendered judgment of strict foreclo-

sure and awarded the plaintiff $64,405.17 in attorney's fees under § 52-249 (a).

"It is axiomatic that the sum of damages awarded as compensation in a breach of contract action should place the injured party in the same position as he would have been in had the contract been performed. . . . The injured party . . . is entitled to retain nothing in excess of that sum which compensates him for the loss of his bargain. . . . Guarding against excessive compensation, the law of contract damages limits the injured party to damages based on his actual loss caused by the breach. . . . The concept of actual loss accounts for the possibility that the breach itself may result in a saving of some cost that the injured party would have incurred if he had had to perform. . . . In such circumstances, the amount of the cost saved will be credited in favor of the wrongdoer . . . that is, subtracted from the loss . . . caused by the breach in calculating [the injured party's] damages." (Internal quotation marks omitted.) *Hees* v. *Burke Construction, Inc.*, 290 Conn. 1, 7–8, 961 A.2d 373 (2009). It also is well established "that the burden of proving damages is on the party claiming them. . . . When damages are claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty." (Internal quotation marks omitted.) *Frillici* v. *Westport*, 264 Conn. 266, 283, 823 A.2d 1172 (2003); see also *Carrano* v. *Yale-New Haven Hospital*, 279 Conn. 622, 646, 904 A.2d 149 (2006) ("[d]amages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty" [internal quotation marks omitted]).

Applying these principles to the present case, we conclude that the trial court improperly rejected the attorney trial referee's recommendation in awarding the plaintiff the balance allegedly remaining on the parties' contract. As we previously have indicated, the evidence

established, and the attorney trial referee correctly found, that, at the time of the purported breach, the plaintiff had been paid approximately 96 percent of the total revised contract price of $809,399.98 but had completed only 95 percent of the work. Indeed, the plaintiff presented no admissible evidence to rebut this finding, which the trial court itself did not question. Thus, the attorney trial referee properly found that the plaintiff had failed to meet its burden of proving that it had furnished any materials or services in connection with the contract balance of $30,761.98. See *Hees* v. *Burke Construction, Inc.*, supra, 290 Conn. 8 (contract damages limited to actual loss caused by breach). In fact, the evidence presented indicates that the plaintiff had been *overpaid* for the work it actually had performed at the time of termination. Although the trial court expressly stated that it had accepted all of the attorney trial referee's findings and recommendations, the court nevertheless awarded the plaintiff the balance allegedly remaining on the contract. Viewing the undisputed evidence in light of the governing legal principles, we can only assume that that portion of the award was improperly made.

Although the plaintiff and Mercede acknowledge that the trial court's award of $30,761.98 is incompatible with the attorney trial referee's recommendation, they attempt to salvage the award, asserting that, notwithstanding the trial court's acceptance of the attorney trial referee's report, the court "apparently" found, on the basis of an independent review of the record, "that [the plaintiff] had earned the entire contract balance." To support this contention, the plaintiff and Mercede point to the costs associated with what they characterize as "[the plaintiff's] numerous good faith attempts to complete the work, the increased administrative work/costs required by the purchase and storage of materials, the attendance at walkthroughs and the creation of a

punch list . . . ." We reject this argument. No evidence was adduced from which the trial court could have ascertained the value of any of the aforementioned items. Consequently, the court had no factual basis for determining the value of those items, let alone that they represented a contract balance of $30,761.98. More importantly, however, there is nothing in the record to indicate that the trial court intended to deviate from the attorney trial referee's recommendations in any respect. To the contrary, the trial court stated that it accepted all of the findings and recommendations of the attorney trial referee. It is evident, therefore, that the trial court's inclusion of the alleged contract balance in the plaintiff's damages award was improper.

Because there is no evidence that the plaintiff furnished any materials or provided any services in connection with the contract balance, we also agree with Jeffrey Miller that the judgment of foreclosure must be reversed because, under well established precedent, "[t]he purpose of the [mechanic's lien] statute is to give a contractor security for labor and material. . . . If the materials are not furnished, and the work is not done, in the construction, raising, removal or repairs of a building, there can be no lien." (Citations omitted.) *Stone* v. *Rosenfield*, 141 Conn. 188, 191–92, 104 A.2d 545 (1954); see also *Intercity Development, LLC* v. *Andrade*, 286 Conn. 177, 184, 942 A.2d 1028 (2008) ("[p]rior precedent from this court [makes clear] that the [mechanic's lien] statute was not intended to provide a security interest for a builder's expectation of profit" [internal quotation marks omitted]); *Seaman* v. *Climate Control Corp.*, 181 Conn. 592, 602, 436 A.2d 271 (1980) ("our statutory provisions [limit] . . . the totality of mechanic's liens to the unpaid contract debt owed by the owner to the general contractor"); *Brin* v. *Mesite*, 89 Conn. 107, 110, 93 A. 4 (1915) ("[The mechanic's] lien secured the plaintiff's claim for mate-

rial furnished and services rendered in the construction of the building. It did not afford him security for his loss of profit or damage suffered by his being prevented from completing the work."). Consequently, that portion of the judgment of the trial court, *Karazin, J.*, awarding the plaintiff attorney's fees of $64,405.17 pursuant to § 52-249 (a) also must be reversed because such an award is authorized only when a valid judgment of foreclosure has been obtained.[29] See General Statutes § 52-249 (a).

## III

Jeffrey Miller also contends that the trial court improperly accepted the attorney trial referee's recommendation that the plaintiff should recover damages for the delays in construction caused by the change orders that had been submitted to the plaintiff, as well as for the delay in the issuance of the wetlands approval. Jeffrey Miller claims that the contract permitted monetary damages only for the delays that had been caused by his use of his own subcontractors; for all other delays, he asserts, the plaintiff's exclusive remedy was to seek an extension of time within which to complete construction. Jeffrey Miller further maintains that, even if the contract reasonably could be interpreted as allowing damages for other types of delays, the attorney trial referee's calculation of delay days was improper as a matter of law.

The following facts are relevant to our analysis of this claim. As we previously indicated, article 2 of the original contract afforded the plaintiff 240 calendar days from the date of the issuance of the building permit

---

[29] In light of our determination that the award of attorney's fees to the plaintiff must be reversed in its entirety, we do not reach Jeffrey Miller's claim that the award improperly included fees for all of the work that had been performed in the case when it should have been limited to the fees incurred solely in connection with the foreclosure proceeding.

within which to achieve "[s]ubstantial [c]ompletion" of construction. Under article 8, the plaintiff was required to obtain any building permits, and Jeffrey Miller was required to obtain wetlands approval. Article 13 of the contract allowed Jeffrey Miller, "without invalidating the [c]ontract, [to] order changes in the [w]ork consisting of additions, deletions, or modifications, the [c]ontract [s]um and [c]ontract [t]ime being adjusted accordingly. Such changes in the [w]ork shall be authorized by written [c]hange [o]rder . . . ." Article 13 also provided that "[t]he cost or credit to the [o]wner from a change in the [w]ork shall be determined by mutual agreement." Over the course of the construction, Jeffrey Miller requested, and the plaintiff agreed to, 113 changes. These changes increased the contract price from $648,394 to $803,090.98, and extended the contract by an additional 86 business days. After the breakdown in the parties' relationship, the plaintiff sent Jeffrey Miller a final change order purporting to extend the duration of the contract an additional 67 days, for a total addition of 153 days to the original construction schedule. Jeffrey Miller, however, never signed this final change order.

The plaintiff sought damages for the 153 additional days, including the 67 days attributable to the plaintiff's own change order, claiming that article 12 of the contract[30] permitted the recovery of damages for all con-

---

[30] Article 12 of the contract, entitled "CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS," provides: "12.1 The [o]wner reserves the right to perform construction or operations related to the [p]roject with the [o]wner's own forces, and to award separate contracts in connection with other portions of the [p]roject or other construction or operations on the site under conditions of the contract identical or substantially similar to these, including those portions related to insurance and waiver of subrogation.

"If the [c]ontractor claims that delay or additional cost is involved because of such action by the [o]wner, the [c]ontractor shall make such claim as provided elsewhere in the [c]ontract [d]ocuments.

"12.2 The [c]ontractor shall afford the [o]wner and separate contractors reasonable opportunity for the introduction and storage of their materials

struction delays attributable to Jeffrey Miller. The plaintiff also sought damages for 75 delay days relating to Jeffrey Miller's use of his own subcontractors, and 120 delay days occasioned by his alleged failure to obtain wetlands approval in a timely manner. Although the attorney trial referee rejected the plaintiff's claim for delay damages relating to Jeffrey Miller's use of his own subcontractors, he found that the plaintiff was entitled to damages for the 153 delay days that it claimed in connection with the various change orders, as well as 75 delay days attributable to Jeffrey Miller's failure to obtain wetlands approval in timely fashion, for a total of 228 delay days. With respect to the wetlands approval, the attorney trial referee stated: "As to the 120 day delay purportedly caused by [Jeffrey Miller's] failure to obtain wetlands approval, it appears that only the period between June 18 and September 2 [2000] related to the wetlands problem, and the remaining time was ordinary processing time. Therefore 75 days are attributable to [Jeffrey] Miller." With respect to the change orders, the attorney trial referee stated: "[The final change order] reflects a total of 153 . . . delay days . . . occasioned by various changes to the project. [Jeffrey] Miller did not object to that calculation at the time it was submitted in February, 2000. [He] had previously agreed in writing to at least 86 . . . delay days. The additional 67 delay [days] reflect additional changes, lead times and delays caused by [Jeffrey Miller] after [his] written agreement and are adequately proven." The attorney trial referee then recommended an award to the plaintiff in the amount of $1019.41 for each delay day, an amount that, according to the attorney trial referee, represented the plaintiff's "profit

and equipment and performance of their activities, and shall connect and coordinate the [c]ontractor's construction and operations with theirs as required by the [c]ontract [d]ocuments.

"12.3 Costs caused by delays, improperly timed activities or defective construction shall be borne by the party responsible therefor."

. . . for each calendar day in the year 2000." Because the attorney trial referee found that there were a total of 228 delay days, he recommended an award of $232,425.48 ($1019.41 x 228), not including the $3660.67 in lost profit.

The attorney trial referee offered no explanation for his finding that the additional construction time authorized by the change orders, and the period from June 18 to September 2, 2000, that was required for the town to issue wetlands approval, constituted compensable delays within the meaning of article 12 of the contract. The attorney trial referee also failed to explain why he rejected Jeffrey Miller's arguments that the plaintiff was not entitled to any damages for those purported delays. In particular, the attorney trial referee did not address Jeffrey Miller's contention that article 12 of the contract permitted damages only for delays caused by his subcontractors and that the exclusive remedy for all other delays was an extension of time under article 14.[31] In essence, Jeffrey Miller maintained that the additional time required to complete construction that had resulted from the change orders and the delay in obtaining wetlands approval were not compensable under article 12 because the parties' contract makes it clear that the parties did not intend for such a result. We agree with Jeffrey Miller that the attorney trial referee improperly rejected these arguments.

## A

We turn first to Jeffrey Miller's claim that the attorney trial referee improperly construed article 12 as permit-

---

[31] Article 14 of the contract provides in relevant part: "14.3 If the [c]ontractor is delayed at any time in progress of the [w]ork by changes ordered in the [w]ork, by labor disputes, fire, unusual delay in deliveries, abnormal adverse weather conditions not reasonably anticipatable, unavoidable casualties or any causes beyond the [c]ontractor's control, or by other causes which the [a]rchitect determines may justify delay, then the [c]ontract [t]ime shall be extended by [c]hange [o]rder for such reasonable time as the [a]rchitect may determine."

ting an award of damages for delays in the permitting and wetlands approval process. It is well established that "[a] contract must be construed to effectuate the intent of the parties, which is determined from [its] language . . . interpreted in the light of the situation of the parties and the circumstances connected with the transaction." (Internal quotation marks omitted.) *Allstate Life Ins. Co.* v. *BFA Ltd. Partnership*, 287 Conn. 307, 313, 948 A.2d 318 (2008). "If a contract is unambiguous within its four corners, intent of the parties is a question of law requiring plenary review. . . . [When] the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms." (Internal quotation marks omitted.) *O'Connor* v. *Waterbury*, 286 Conn. 732, 744, 945 A.2d 936 (2008). It also is settled that "[t]he individual clauses of a contract . . . cannot be construed by taking them out of context and giving them an interpretation apart from the contract of which they are a part. . . . A contract should be construed so as to give full meaning and effect to all of its provisions . . . ." (Citations omitted; internal quotation marks omitted.) *Levine* v. *Advest, Inc.*, 244 Conn. 732, 753, 714 A.2d 649 (1998); see also 5 A. Corbin, Contracts (1998) § 24.21, p. 204 ("the terms of a contract are to be interpreted and their legal effects determined as a whole").

Article 12 of the contract provides in relevant part: "12.1 The [o]wner reserves the right to perform construction or operations related to the [p]roject with the [o]wner's own forces, and to award separate contracts in connection with other portions of the [p]roject or other construction or operations on the site under conditions of the contract identical or substantially similar to these, including those portions related to insurance and waiver of subrogation.

"If the [c]ontractor claims that delay or additional cost is involved because of such action by the [o]wner,

the [c]ontractor shall make such claim as provided elsewhere in the [c]ontract [d]ocuments."

Under provision 12.2, which is part of article 12, the contractor is required to "afford the [o]wner and separate contractors reasonable opportunity for the introduction and storage of their materials and equipment and performance of their activities, and shall connect and coordinate the [c]ontractor's construction and operations with theirs as required by the [c]ontract [d]ocuments." Provision 12.3, which also is a part of article 12, provides that the "[c]osts caused by delays, improperly timed activities or defective construction shall be borne by the party responsible therefor."

We agree with Jeffrey Miller that, by its plain and unambiguous terms, article 12 imposes liability solely for the delays occasioned by the owner's exercise of his right to perform part of the construction work himself. That interpretation is compelled not only by the language of article 12, which deals exclusively with the owner's right to perform such work, but also by article 14, which provides in relevant part: "14.3 If the [c]ontractor is delayed at any time in progress of the [w]ork by changes ordered in the [w]ork, by labor disputes, fire, unusual delay in deliveries, abnormal adverse weather conditions not reasonably anticipatable, unavoidable casualties or any causes beyond the [c]ontractor's control, or by other causes which the [a]rchitect determines may justify delay, then the [c]ontract [t]ime shall be extended by [c]hange [o]rder for such reasonable time as the [a]rchitect may determine." Courts interpreting similar contract provisions have concluded that, in the absence of a finding that the owner was negligent, acted in bad faith or breached an implied promise not to delay the contractor's work—none of which the plaintiff alleged or was found by the attorney trial referee—the exclusive remedy for construction delays is an extension of time within which to complete construction.

See, e.g., *United States ex rel. Straus Systems, Inc.* v. *Associated Indemnity Co.*, 969 F.2d 83, 85 (5th Cir. 1992) ("[a] provision in the contract for an extension of time in case of delay caused by the contractor has been held to afford the subcontractor an exclusive remedy, precluding the recovery of damages from the contractor"); *Burgess Construction Co.* v. *M. Morrin & Son Co.*, 526 F.2d 108, 114–15 (10th Cir. 1975) (trial court properly concluded that provision for extension of time in case of delay precluded recovery of monetary damages for such delay), cert. denied, 429 U.S. 866, 97 S. Ct. 176, 50 L. Ed. 2d 146 (1976); *United States ex rel. Brown* v. *Miller-Davis Co.*, 61 F. Sup. 89, 90 (D. Conn. 1945) (provision in contract for extension of time in event of delay was subcontractor's exclusive remedy for construction delay caused by owner). This is so because, as the Court of Appeals for the Tenth Circuit has explained, "[i]n such cases it is a reasonable construction of the contract that delays . . . were anticipated and fully provided for by the provision for an extension of time." (Internal quotation marks omitted.) *Burgess Construction Co.* v. *M. Morrin & Son Co.*, supra, 114. In the present case, such an interpretation is particularly apt—indeed, it is compelled—in view of the fact that the contract *expressly* imposed liability for delays occasioned by Jeffrey Miller's decision to perform part of the construction work himself and by his use of separate subcontractors. We must assume that, if the parties had intended to impose liability on Jeffrey Miller for other types of delays, they would have done so explicitly.

Our conclusion is reinforced by article 2 of the contract. As we previously indicated, under that article, the plaintiff had 240 days within which to achieve "[s]ubstantial [c]ompletion" of the construction project. That 240 day period, however, did not begin to run until all required building permits had been issued. Thus, it

is clear that the parties agreed to extend the project completion date by however much time was necessary to obtain the required building permits, thereby ensuring that, if the permitting process took longer than expected, the plaintiff would not be penalized by the delay. We agree with Jeffrey Miller that, by specifically contemplating that delays might occur in the permitting process and by providing a remedy for them should they occur—namely, an extension of time within which to complete construction—article 2 further evinces the parties' intent that extensions of time were to be the exclusive remedy for delays not covered by article 12, including any delays relating to the permitting and wetlands approval process.[32] Indeed, to interpret the contract as the attorney trial referee has interpreted it would require us to conclude that the parties intended, without expressly saying so, that Jeffrey Miller would be strictly liable for damages associated with every additional day that it took the town to give its wetlands approval, a process over which Jeffrey Miller had no control. In the absence of explicit contract language imposing such liability, and in light of the other provisions in the contract reflecting the parties' intent that an extension of the duration of the contract would be the exclusive remedy for delays not covered under article 12, we conclude that the parties did not intend to impose liability for delays in the permitting and wetlands approval process.

B

We next address Jeffrey Miller's claim that the attorney trial referee improperly determined that the plaintiff was entitled to recover damages for delay in the comple-

---

[32] We note that the plaintiff and Mercede neither defend the merits of the attorney trial referee's interpretation of the parties' contract nor respond to Jeffrey Miller's arguments challenging that interpretation. The plaintiff and Mercede merely assert, in conclusory fashion, that the attorney trial referee's interpretation was correct.

tion of the contract resulting from the change orders. This court recently has observed that, "in the context of a home improvement project, [change orders] are generally itemizations of changes to the project requested by the owner or necessitated by the circumstances and executed by the contractor, *resulting in adjustments of the completion date and contract price.* See American Institute of Architects, Standard Form of Agreement Between Owner and Contractor § 7.2.1 ([a] [c]hange [o]rder is a written instrument prepared by the [a]rchitect and signed by the [o]wner, [c]ontractor and [a]rchitect, stating their agreement [on] all of the following: .1 change in the work; .2 the amount of the adjustment in the [c]ontract [s]um, if any; and .3 the extent of the adjustment in the [c]ontract [t]ime, if any); see also 1 J. Sweet & J. Sweet, Construction Industry Contracts (4th Ed. 1999) § 11.01, p. 321 (Noting that the term traditionally referred to the method by which the owner exercises a contractual power to change the work. Usually, construction contracts give the owner the power, within limits, to change the work unilaterally. The contractor must comply before there has been any agreement resulting in a price and time adjustment.)." (Emphasis added; internal quotation marks omitted.) *Economos* v. *Liljedahl Bros., Inc.*, 279 Conn. 300, 302–303 n.4, 901 A.2d 1198 (2006). This definition is consistent with the change order provisions of the contract at issue in the present case, which provide: "13.1 The [o]wner, without invalidating the [c]ontract, may order changes in the [w]ork consisting of additions, deletions or modifications, the [c]ontract [s]um and [c]ontract [t]ime being adjusted accordingly. Such changes in the [w]ork shall be authorized by written [c]hange [o]rder signed by the [o]wner, [c]ontractor and [a]rchitect . . . .

"13.2 The [c]ontract [s]um and [c]ontract [t]ime shall be changed only by [c]hange [o]rder.

"13.3 The cost or credit to the [o]wner from a change in the [w]ork shall be determined by mutual agreement."

As we previously indicated, Jeffrey Miller ordered a number of changes during the course of construction, and he was entitled to do so under article 13 of the contract. For the requested changes, the plaintiff prepared change orders, in which it quoted a price for the work and the amount of time that the work would add to the total contract time, which, under the terms of the contract, was the time specified in article 2 within which the plaintiff was required to achieve substantial completion of the project. It is perfectly clear, therefore, that the extensions of time agreed on in the change orders were for the benefit of *the plaintiff* and were intended to provide the plaintiff with additional time, above and beyond the time originally allotted, to complete the work in light of the changes requested by Jeffrey Miller. Accordingly, we agree with Jeffrey Miller that the attorney trial referee improperly found that the plaintiff was entitled to damages for the delays attributable to the change orders.

IV

In light of our conclusion in part III of this opinion rejecting the attorney trial referee's finding that the plaintiff was entitled to delay damages under the contract, we briefly address the plaintiff and Mercede's claim, raised in their cross appeal, that the attorney trial referee improperly determined that the $343,351.47 mechanic's lien securing those damages was invalid. We reject this claim. Because the plaintiff was not entitled to recover delay damages, it necessarily follows that any mechanic's lien securing those damages is

invalid.[33] It also follows that the trial court properly concluded that Jeffrey Miller is entitled to $5000 in damages under § 49-8 (c) as a result of the plaintiff's failure to release the invalid lien as Jeffrey Miller had requested. Finally, in view of our determination that Cheryl Miller is not a party to the contract between the plaintiff and Jeffrey Miller; see part I of this opinion; she is not entitled to any portion of the $5000 in damages awarded under § 49-8 (c).

V

Finally, we consider Jeffrey Miller's claim that the trial court improperly declined to award him reasonable attorney's fees under § 49-8 (c) for his successful effort in invalidating the $343,351.47 lien. Jeffrey Miller contends that the trial court failed even to address his claim for attorney's fees and that he is entitled to recover such fees. We agree.

The following facts and procedural history are relevant to our disposition of this issue. In his counterclaim, Jeffrey Miller alleged that both mechanic's liens were invalid and that the plaintiff had violated § 49-8 (c) by failing to release them upon request. The attorney trial referee agreed with Jeffrey Miller that the lien in the amount of $343,351.47 was invalid because it exceeded the total balance due on the parties' contract. Accordingly, the attorney trial referee recommended that Jeffrey Miller be awarded $5000 in damages under General Statutes § 49-8 (c), which provides that, when a lienor fails to release an invalid lien within sixty days of receiving a written request to do so, he or she "shall be liable for damages to any person aggrieved at the rate of two

---

[33] As we previously explained, the attorney trial referee found that the lien in the amount of $343,351.47 was invalid because it exceeded the balance due on the contract. Although we agree that the lien is invalid, we reach that conclusion because the plaintiff is not entitled to the delay damages on which the lien was predicated.

hundred dollars for each week after the expiration of such sixty days up to a maximum of five thousand dollars or in an amount equal to the loss sustained by such aggrieved person as a result of the failure of the mortgagee or plaintiff or the plaintiff's attorney to execute and deliver a release, whichever is greater, *plus costs and reasonable attorney's fees.*" (Emphasis added.) Notwithstanding the plain language of the statute directing that the prevailing party *shall* be awarded damages "*plus . . .* reasonable attorney's fees"; (emphasis added) General Statutes § 49-8 (c); the attorney trial referee determined that he was not authorized to make a recommendation with respect to those fees and, consequently, left that determination to the trial court. Thereafter, Jeffrey Miller's attorney filed an affidavit detailing the work that he had done to secure the release of the $343,351.47 lien and his fees for those services. After the trial court issued its memorandum of decision accepting all of the attorney trial referee's findings but failing to address the issue of attorney's fees, Jeffrey Miller sought an articulation of why the trial court had failed to award him attorney's fees under § 49-8 (c). That request was denied without explanation.

The plaintiff previously had filed a request for attorney's fees under § 52-249 (a), which the trial court also denied. In doing so, the court explained that the plaintiff had agreed to release both mechanic's liens so that Jeffrey Miller could sell the home. In return, Jeffrey Miller had agreed to place $375,000 of the proceeds from the sale of the home in escrow to guarantee full payment of the plaintiff's judgment. The court explained that § 52-249 (a) permits an award of attorney's fees only in actions to foreclose a mechanic's lien or on a bond that has been substituted for a mechanic's lien. The court concluded that because no such action had been filed in the present case, the attorney's fee provision of § 52-249 (a) was inapplicable.

The plaintiff filed a motion for reargument and reconsideration of the trial court's ruling, and Jeffrey Miller filed a detailed objection to that motion, again asserting *his* entitlement to attorney's fees under § 49-8 (c). With respect to his claim for attorney's fees under § 49-8, Jeffrey Miller noted that, although the attorney trial referee had explained that he was leaving the determination of such fees to the trial court, "the [c]ourt has never ruled on these fees."

While the plaintiff's motion for reargument and reconsideration was pending, Judge Lewis, who had presided over the case, became ill and unable to work. The plaintiff's motion therefore was assigned to the court, *Karazin, J.*, which, after entertaining oral argument, granted the plaintiff's motion and awarded the plaintiff $64,405.17 in attorney's fees. In oral argument before Judge Karazin, Jeffrey Miller's attorney argued that the plaintiff was not entitled to attorney's fees under § 52-249 (a) because, among other reasons, both of the mechanic's liens that the plaintiff had filed on the property were invalid under § 49-33. Jeffrey Miller's attorney also explained that the court had failed to award Jeffrey Miller *his* attorney's fees under § 49-8 (c), stating: "The attorney trial referee said I [get] attorney's fees because [the plaintiff filed] an invalid mechanic's lien [on my client's property], the [$343,351.47] one. Judge Lewis has never given them to us. . . . I get them . . . under the statute." Although the plaintiff's counsel did not dispute these assertions, Judge Karazin nevertheless failed to address them in granting the plaintiff's motion for reconsideration and awarding the plaintiff attorney's fees.

Thereafter, while this appeal was pending, Jeffrey Miller filed a motion for review and request for articulation of the trial court's reasons for failing to award him attorney's fees. We granted the motion and directed the trial court to articulate its reasons for failing to address

Jeffrey Miller's claim for attorney's fees and, if the court's failure to address the issue had been an oversight, to decide the issue. Thereafter, the court, *Karazin, J.*, issued an articulation in which it stated that it had not addressed Jeffrey Miller's request for attorney's fees because "it was not before [the] court on any of the pleadings. Therefore, [the] court did not neglect to rule as the result of an oversight but rather because that issue was not before [the] court."

Suffice it to say that, based on the foregoing procedural history, Jeffrey Miller's claim for attorney's fees was squarely before the court in filings that Jeffrey Miller's attorney had submitted at several stages of the proceedings, including the proceeding before the court, *Karazin, J.* Accordingly, we agree with Jeffrey Miller that the case must be remanded to the trial court for a determination of reasonable attorney's fees, in accordance with § 49-8 (c).[34]

---

[34] We note that Jeffrey Miller raised his claim of entitlement to attorney's fees *under § 49-8 (c)* for the first time in his reply brief to this court. In his original brief to this court, Jeffrey Miller claimed that he was entitled to such fees under article 15 of the parties' contract, which provides in relevant part: "15.4 Final payment shall not become due until the [c]ontractor has delivered to the [o]wner a complete release of all liens arising out of this [c]ontract or receipts in full covering all labor, materials and equipment for which a lien could be filed, or a bond satisfactory to the [o]wner to indemnify the [o]wner against such lien. If such lien remains unsatisfied after payments are made, the [c]ontractor shall refund to the [o]wner all money that the [o]wner may be compelled to pay in discharging such lien, including all costs and reasonable [attorney's] fees."

In his reply brief, Jeffrey Miller claimed that he is entitled to attorney's fees under both the contract and § 49-8 (c). Jeffrey Miller also detailed the long and tortured procedural history surrounding his attorney's efforts to obtain a ruling under § 49-8 (c), which, as Jeffrey Miller correctly observes, mandates attorney's fees to the prevailing party. As a general rule, we do not address claims that are raised for the first time in a reply brief. E.g., *SS-II, LLC* v. *Bridge Street Associates*, 293 Conn. 287, 302, 977 A.2d 189 (2009). Under the unusual circumstances of the present case, however, we conclude that an exception to this general rule is warranted. In particular, Jeffrey Miller's claim for attorney's fees under § 49-8 (c) mirrors his claim under the contract; consequently, the plaintiff is not prejudiced in any way by our consideration of the statutory claim. Furthermore, the plaintiff and

The judgment is reversed insofar as it holds Cheryl Miller liable for damages to the plaintiff, The FCM Group, Inc. (FCM), and awards Cheryl Miller damages against FCM, insofar as it holds Frank C. Mercede III individually liable to any of the defendants, insofar as it awards attorney's fees and costs to FCM under § 52-249 (a), insofar as it orders strict foreclosure, and insofar as it awards FCM delay damages and any other damages, except for $3660.67 in lost profit; that portion of the judgment awarding FCM $3660.67 in lost profit and awarding Jeffrey Miller $5000 under § 49-8 (c) is affirmed; the case is remanded with direction to determine the reasonable attorney's fees to which Jeffrey Miller is entitled under § 49-8 (c) in connection with the invalidation of the mechanic's lien in the amount of $343,351.47.

In this opinion the other justices concurred.

---

Mercede could have addressed the issue, if they had chosen to do so, in the reply brief that they filed with this court in support of their cross appeal, which represented the final word between the parties prior to oral argument before this court, and which also raised an issue pertaining to attorney's fees. Finally, at no time has the plaintiff or Mercede claimed, either on substantive or procedural grounds, that Jeffrey Miller is not entitled to attorney's fees under § 49-8 (c) in the event that the lien ultimately is determined to be invalid. We therefore see no reason not to consider Jeffrey Miller's claim under § 49-8 (c).