**UNITED STATES STEEL CORPORA-
TION, Appellee,**

v.

**MISSOURI PACIFIC RAILROAD
COMPANY, Appellant.**

No. 80–1935.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 17, 1981.

Decided Jan. 14, 1982.

Rehearing and Rehearing En Banc
Denied March 12, 1982.

Herschel H. Friday and B. S. Clark (argued), Little Rock, Ark., for appellant.

Rose Law Firm, Phillip Carroll (argued), Little Rock, Ark., for appellee.

Before STEPHENSON and McMILLIAN, Circuit Judges, and HANSON,* Senior District Judge.

HANSON, Senior District Judge.

We are asked to review in this diversity action the district court's application of the principle of "active interference" in resolving a dispute arising out of a contract between appellant, the Missouri Pacific Railroad (Mopac), and appellee, United States Steel. Mopac contracted with United States Steel's American Bridge Division (ABD) for alteration of the superstructure of two Mopac railroad bridges which spanned the Arkansas River at Little Rock, Arkansas. The work was necessitated by development of the Arkansas River as a navigable stream pursuant to an act of Congress. The initiation of ABD's field work was contingent upon the completion of certain work by the substructure contractor, Al Johnson Construction Co. Johnson encountered unforeseen obstacles which caused repeated revisions in its scheduled completion date. While ABD was contractually bound to apprise itself of Johnson's work progress and adjust its schedule accordingly, it was also bound to heed Mopac's notice to proceed and commence work when such notice was given. ABD commenced its work, suffering additional and unnecessary costs when its access to the construction site was delayed. U.S. Steel, on behalf of ABD, brought this action to recover these increased costs from Mopac.

Following a bench trial, the district court found that Mopac, by giving notice to proceed to ABD when it knew that delay of Johnson's work was inevitable, actively interfered with ABD's ability to maintain a flexible work schedule in the face of Johnson's difficulties; the result being that Mopac was liable for damages[1] suffered by ABD while it waited for 175 days past its original start-up date to gain access to the job site. Mopac concedes liability for 25 days of this delay, but argues on appeal that the contract's no damage for delay clause precludes recovery by ABD for the remaining 150 days, that the evidence is insufficient to support the district court's conclusion of active interference, and that certain aspects of the damage award were either not supported by the evidence or were improperly awarded. We affirm the lower court in all aspects.

I.

Mopac awarded ABD a contract to alter the superstructure of the Junction and Baring Cross Bridges on October 24, 1968. ABD could not begin its work until the substructure contractor, Johnson, completed work on the south pier of the Junction Bridge and constructed a "shoofly", which is a temporary bridge used to reroute rail traffic during construction. Johnson was under contract to complete this phase of its work within one year of receipt of notice to proceed, which was given by Mopac on August 6, 1968.

On November 22, 1968, Mopac issued a notice to proceed to ABD, which triggered the following provision in their contract:

The contractor will be required to commence work under the contract within 10 calendar days after the date of receipt of Notice to Proceed, to prosecute and work with faithfulness and diligence so as to complete the entire work not later than the number of calendar days stipulated in Section 3 and the Proposal after date of receipt by the Contractor of written Notice to Proceed. Extension to the time allowed for completion may be granted

---

* The Honorable William C. Hanson, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

1. The district court also found that Mopac was liable for damages to ABD for a further 71 days of delay which were directly attributable to Mopac. The finding of liability and the award of damages for these delays are not contested by Mopac on this appeal. We confine our discussion in this opinion to those circumstances relevant to the 150 days of delay for which the district court found Mopac liable under the theory of active interference.

pursuant only to the provisions set forth elsewhere in these Specifications.

As this clause and others in the contract indicated, time was of the essence to Mopac. Failure of ABD to respond to the notice to proceed would constitute breach. In addition, the contract's liquidated damages clause made ABD liable for $600 in damages per day for every day its work exceeded the completion date. Consequently, when ABD received its notice, it began immediately to prepare shop drawings, place mill orders, begin steel fabrication, set dates for shipping equipment and materials, and prepare work schedules. ABD's first work schedule sent to Mopac indicated that it expected its start-up date for field work to be September 1, 1969. This date was based on the assumption that Johnson would complete its work as scheduled on August 6, 1969.

ABD's first indication that Johnson was encountering problems came when it made an on-site inspection on March 5, 1969, and discovered that Johnson was over three months behind schedule. Six days later Mopac's chief engineer wrote ABD, informing it that Johnson had pushed back its completion date from August 6 to November 2, 1969. Johnson was advised by Mopac that this delay would conflict with ABD's fabrication and erection schedule; nevertheless, ABD had no choice but to revise its schedule accordingly, setting a new start-up date at sometime in early November 1969.

On July 2, 1969, Mopac informed ABD that Johnson had again pushed back its completion date—it would complete the Junction Bridge pier work in mid-November, but the shoofly would not be completed until December 31, 1969. ABD again revised its schedule, anticipating access to the job site in the first week of January 1970. In July Mopac notified ABD that Johnson did not expect the shoofly to be completed until January 11, 1970; in August, Mopac told ABD that Johnson had pushed its completion date back another two weeks. ABD twice reset its start-up date to conform with these revisions.

ABD received no further word during the fall of 1969 about Johnson's work progress, but during an on-site visit on December 15, 1969, ABD learned that the shoofly would probably not be completed until February 1, 1970. ABD promptly informed Mopac that it was too late for it to stop shipments of fabricated steel to the job site and that it would suffer extra expenses for the attendant demurrage, equipment rental, and overhead.

ABD's first steel shipment arrived at the job site on December 29, 1969, it moved onto the job site on January 5, 1970, and three days later Mopac disclosed that ABD could not start its work until the second week in February. ABD in fact was unable to commence work until February 23, 1970. The total delay from the originally scheduled start-up date of September 1, 1969, to February 23, 1970, was 175 days. Mopac informed ABD that the completion date for ABD's work would be adjusted 175 days thus relieving ABD from any claim for liquidated damages for failure to complete its work on schedule.

Requiring mention are the difficulties encountered by Johnson, which were the subject of a prior lawsuit. *Al Johnson Construction Co. v. Missouri Pacific Railroad Co.*, 426 F.Supp. 639 (E.D.Ark.1976), aff'd mem., 553 F.2d 103 (8th Cir. 1977). In that case Johnson sued Mopac for increased costs under the changed circumstances clause of their contract. The plans and specifications supplied by Mopac did not reveal, among other matters, that a rock ledge obstructed an area of the riverbed where the south pier was to be constructed for the Junction Bridge which forced Johnson to change to a different and more costly method of construction. Johnson also found steel in the riverbed (the remains of an old, collapsed bridge) at other places where piles were to be driven. Recovery by Johnson was permitted for the increased costs caused by these changed circumstances.

The district court in the present case gave collateral estoppel effect to the fact findings of the *Johnson* case, which are part of the record here. The court found that

Mopac knew about the rock ledge and the steel in the riverbed before it issued the notice to proceed to ABD. It also found that Mopac should have known delay by Johnson was inevitable because of these unforeseen circumstances. Johnson would be forced to redesign and employ a differ-ent type of cofferdam[2] than originally planned, remove the rock ledge, and drive piles through steel at several different points. See Johnson, supra, 426 F.Supp. at 644. The district court also found that once notice was given by Mopac to ABD, a series of events of great momentum were set in motion by ABD in order to be prepared to start construction on September 1, 1969. The lower court observed that ABD did its best to adjust its work schedules according to updates it received on Johnson's progress (or lack of it), but additional expenses to some degree were unavoidable.[3] The court concluded that Mopac, by issuing the notice to proceed with knowledge of Johnson's de-lay-causing problems, actively interfered with ABD's ability to plan and execute its work in a timely and economically efficient fashion. Following a separate hearing on damages, the court awarded ABD $364,232 which included compensation for increased costs incurred both by Mopac's active inter-ference and by other delays during con-struction directly attributable to Mopac (see note 1, supra).

## II.

Mopac first argues that the following "no damage" clause in the contract precludes the award of damages to ABD for any delay caused by Johnson's untimely comple-tion of its work: "Failure of the substruc-ture contractor to complete his work on a specified date or dates shall not form a basis for claim for extra compensation by this superstructure contractor." Such no damage clauses, when clear and unambigu-ous, are regarded as valid and will be en-forced according to their terms. See Peter Kiewit Sons' Co. v. Iowa Southern Utilities Co., 355 F.Supp. 376, 396–97 (S.D.Iowa 1973) and cases cited therein. Indeed, the district court in this case upheld the validity of the no damage clause, concluding that Johnson's nonperformance "cannot serve as the predicate for damages from the rail-road, it having expressly and unambiguous-ly shifted the risk of such nonperformance to [ABD]." Mem. op. at 5.

■ What Mopac actually challenges is the lower court's application of the principle of active interference, a judicially recog-nized exception to the no damage clause which permitted recovery. Given the harsh effect of no damage clauses, courts will strictly construe such provisions but gener-ally enforce them absent delay (1) not con-templated by the parties under the provi-sion, (2) amounting to an abandonment of the contract, (3) caused by bad faith, or (4) amounting to active interference. Peter Kiewit Sons', supra, 355 F.Supp. at 397; see also E. C. Ernst, Inc. v. Manhattan Const. Co. of Texas, 551 F.2d 1026, 1029 (5th Cir. 1977), mod. on other grounds, 559 F.2d 268 (5th Cir. 1977), cert. denied, 434 U.S. 1067, 98 S.Ct. 1246, 55 L.Ed.2d 769 (1978).

■ The active interference exception arises from the notion that in a contract such as the one in the instant case—where-in time is of the essence, yet the contrac-tee's liability for delay is limited through a no damage clause—there is implied an obli-gation on the part of the contractee to refrain from anything that would unreason-ably interfere with the contractor's oppor-tunity to proceed with its work in the man-ner provided by the contract and to permit the contractor to carry on that work with reasonable economy and dispatch. Taylor-Fichter Steel Constr. Co. v. Niagara Fron-tier Bridge Com'n., 261 App.Div. 288, 25 N.Y.S.2d 437, 441, aff'd without op., 287

---

**2.** A cofferdam is a watertight temporary struc-ture that has been pumped dry so that the bridge foundation may be constructed within it.

**3.** We do not understand Mopac to challenge the finding that additional and unavoidable ex-penses indeed were incurred by ABD, although Mopac does challenge in certain particulars the amount of damages suffered and awarded. Mopac's main argument, in effect, is that while ABD may have suffered damages for delay, Mopac is not responsible for them.

N.Y. 669, 39 N.E.2d 290 (1941). Liability, however, is not created merely because of claimed interference caused by the delay of another contractor employed by defendant, *id.*; after all, this is precisely the type of liability which the no damage clause seeks to prevent. Nor is defendant liable for delay resulting from "a simple mistake, error in judgment, lack of total effort, or lack of complete diligence." *Peter Kiewit Sons', supra,* 355 F.Supp. at 399. As the name implies, active interference requires a finding that defendant committed some affirmative, willful act in bad faith which unreasonably interfered with the contractor's compliance with the terms of the construction contract. *Id.*

Courts have found active interference where the contractee, despite knowledge of delay-causing conditions, has issued notice to proceed to the contractor resulting in increased costs because of the contractor's premature initiation of its work. *Gasparini Excavating Co. v. Pennsylvania Turnpike Comm'n.,* 409 Pa. 465, 187 A.2d 157 (1963); *Garofano Construction Co. v. State,* 183 Misc. 1080, 52 N.Y.S.2d 186 (1944); *American Bridge Co. v. State,* 245 App.Div. 535, 283 N.Y.S. 577 (1935). In such a case the affirmative willful act is the issuance of the notice to proceed; the requisite bad faith is demonstrated by proof of the contractee's knowledge that delay-causing circumstances exist which will likely prevent the contractor from timely proceeding with its work.

The *American Bridge* case, *supra,* like the one before us, was a suit by a bridge superstructure contractor for damages caused when the contractee (the State of New York), with knowledge that the substructure contractor's work would be delayed, issued notice to proceed to American Bridge. American Bridge had the steel for the superstructure fabricated, painted, and ready to erect 21 months before the substructure contractor finally completed its work. As a result, American Bridge suffered increased costs for storing the steel and repainting it after the paint began to deteriorate during storage. The court held that the state's order to proceed was an active interference with American Bridge's operations: "It was the state's order to continue preliminary work in the face of necessary stoppage and postponement of the work on the project itself, which constituted the interference and caused the damage. Not delay, but the requirement of unnecessary, premature, preliminary operations was the interference."

■ A nearly identical situation existed in this case. The lower court concluded,

Until the notice to proceed was issued, ABD had free choice and complete flexibility to reschedule its orders and its work force. But it lost this freedom and flexibility when Mopac issued the notice to proceed on November 22, 1968, at a time when Johnson had already encountered the unexpected rock ledge, redesigned its cofferdam, and found steel in the river bed, all of which should have indicated to Mopac that adjustment in schedules would be necessary because of the inevitable delay these changes would bring in the completion of the substructure work. The notice to proceed had a coercive and restricting effect upon ABD by virtue of the provisions of the contract.

Mopac claims ABD created its own predicament by failing to fulfill its contractual duty to apprise itself of Johnson's progress and schedule its work accordingly. But as the district court observed, *supra,* ABD's ability to fulfill its duty was restricted by Mopac when it issued the notice to proceed. The contract provisions clearly put Mopac in the dominant position in determining when ABD should begin its work. Mopac exercised the advantage of this position when it issued notice. ABD was not in a position to undertake the risk of noncompliance which could result in a finding of breach or, in the event of late performance, assessment of liquidated damages. We therefore adopt the reasoning of the lower court and hold that there was no error in its conclusion that Mopac's active interference created an exception to the enforceability of the no damage clause in the contract.

## III.

Mopac alternatively argues that the evidence is insufficient to support the lower court's conclusion that Mopac actively interfered with ABD's operations. Mopac challenges the finding that steel was discovered in the riverbed before November 22, 1968, when the notice to proceed was given. The district court found that one of Mopac's on-site consulting engineers, Mr. Edwin Young, knew about the steel on October 30, 1968, almost a full month before notice to proceed was issued. But Mopac refers the court to a letter of August 12, 1969, from Johnson to Mopac in which additional compensation is requested for costs related to drilling through steel and claims this to be evidence of the date of the steel's discovery. This request for compensation is not necessarily probative of when the steel was first discovered, and we hold that the district court's finding in this regard is not clearly erroneous. Rule 52(a), F.R.Civ.P.

Mopac next contends that no evidence was offered to indicate that the unexpected presence of the rock ledge actually caused delay. A large portion of the ledge had to be blasted and leveled and the box cofferdam originally called for was abandoned in favor of a cellular cofferdam. Both Young, and Early Owen, an ABD engineer, testified that the originally designed method of construction would have taken three months. The alternative actually employed was not completed until almost a year after the discovery of the rock ledge. We have examined the record as it relates to this matter and again find no clear error in the district court's finding.

Finally, Mopac contends that the real reason for the delay was high water which forced Johnson to stop working on a number of occasions. The main problem appears to have been with the shoofly. Mopac's specifications called for shoofly piles that barely cleared the pool elevation of the river. Concrete pier caps were to be formed on top of the shoofly piles. Apparently heavier rains than normal caused the water level to rise and postpone construction of the pier caps. Mopac claims that the high water problem was not apparent until after it gave notice to proceed to ABD, that the water problem was the major cause for delay, and that it should not be held liable for delay caused by a completely unforeseeable problem which was beyond its control.

Although the evidence on the high water problem is sketchy, it is apparent that the problem presented itself at least by November 29, 1968, within a week after Mopac issued notice to proceed. Had Mopac not actively interfered with ABD by giving the notice when it knew of other delay-causing conditions, the high water problem would have presented itself and Mopac could then have timed the issuing of the notice accordingly. We refuse to excuse Mopac from liability merely because a condition subsequent to its premature notice to proceed also contributed to the delay.[4]

## IV.

■ Mopac also challenges certain aspects of the lower court's damage award relating to rent on idle equipment and field escalation costs. Mopac argues that ABD failed to carry its burden as to when equipment charges to Mopac should have begun. Mopac claims that it cannot be charged for equipment that stood idle during the delay until such equipment arrived at the job site in Little Rock. The effect of this argument is to reduce the award for 83 days of equipment rental to 64 days rent. Alternatively, Mopac argues that if the usual business practice is applied of charging from the date the equipment was shipped from its old job site, then Mopac established that the equipment in question was shipped on a

---

4. Similarly, in the *American Bridge* case, the court was unmoved by the fact that the true extent of the delay was unforeseen by the state at the time it gave the premature notice to proceed. *American Bridge Co. v. State*, 245 App.Div. 535, 283 N.Y.S. 577 (1935). A delay estimated not to exceed 90 to 100 days stretched out to 21 months. Nevertheless, the state knew there would in fact be a delay, thus it was held liable for all damages incurred over the entire 21-month period.

date later than that found by the district court. The consequence of this argument is to reduce the 83 days rent to 68 days.

The district court noted that there was conflicting evidence surrounding when the equipment left the old job site. The court then concluded that ABD could appropriately charge from the date when the equipment was released from its prior job—regardless of whether it was shipped to Little Rock on the date of release. It reasoned, "[W]hen the defendant creates a condition where the equipment cannot be used even after its arrival at the job site, it is not in a position to complain that the equipment was not promptly shipped as soon as it was available." Once the fact of damages is established, trial courts are allowed considerable leeway in arriving at the amount. *Eastman Kodak Co. of New York v. Southern Photo Materials Corp.*, 273 U.S. 359, 378–79, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927); *Clements Auto Co. v. Service Bureau Corp.*, 444 F.2d 169, 190 (8th Cir. 1971). We hold that the district court's award in this regard was fair and reasonable.

Mopac also argues that it should not have been charged rent on a crawler crane and tugboat because the evidence showed that neither piece of equipment was operative during the entire period claimed. The district court found that both pieces of equipment were operative for the majority of the time period claimed; then the court deducted ten days rent on the crawler crane and seven days on the tugboat to account for downtime. Again, we find no error in the lower court's calculation of this aspect of the damage award.

■■ The final element of the damage award challenged by Mopac is $68,276.78 in field escalation costs awarded to compensate ABD for higher labor costs which it was forced to pay because its work extended beyond the originally anticipated completion date. Mopac argues that these costs would have occurred regardless of whether it had actively interfered with the start of ABD's operations, thus it should not be liable for them. We reject this argument. What Mopac essentially argues is that it is Johnson's fault that ABD started its work late, finished it late, and suffered increased costs as a result. But Mopac's liability for Johnson's difficulties has already been established. *Al Johnson Constr. Co. v. Missouri Pacific Railroad, supra.* The district court awarded the field escalation costs on the theory that ABD would not otherwise be made whole for the actual damages and expenses it incurred as a result of the delays. It is established that when performance extends beyond the originally scheduled performance time because of delay, increased costs after the original completion date are not part of the business risks assumed by the contractor and damages may properly be awarded to cover those increased costs. *See J. D. Hedin Const. Co. v. United States*, 347 F.2d 235 (Ct.Cl.1965); *Abbett Electric Corp. v. United States*, 162 F.Supp. 772 (Ct.Cl.1958). Thus we affirm the district court's award of field escalation costs.

Accordingly, the judgment of the district court is affirmed.

McMILLIAN, Circuit Judge, dissenting.

I respectfully dissent. I would reverse and remand to the district court with instructions to reduce the damages award to an allowance of damages for only twenty-five days. First, I am of the opinion that the agreed upon "no damage" clause precludes recovery, and secondly, I can find no affirmative, willful bad faith act to support the active interference theory advanced by ABD.