******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

C AND H ELECTRIC, INC. *v.* TOWN OF BETHEL
(SC 19162)

Palmer, Zarella, Eveleigh, Espinosa and Robinson, Js.

*Argued March 19—officially released August 5, 2014*

*Jeffrey J. White*, with whom, on the brief, were *Gregory R. Faulkner* and *Elizabeth K. Wright*, for the appellant (plaintiff).

*Benjamin B. Manchak*, with whom were *Joshua A. Hawks-Ladds* and, on the brief, *Richard C. Robinson*, for the appellee (defendant).

*Opinion*

ROBINSON, J. This appeal requires us to consider whether a property owner's conduct constituted "active interference" for purposes of an exception to a "no damages for delay" clause in a construction contract, which otherwise would preclude a contractor from recovering additional costs for delays caused by the owner, instead giving a contractor additional time to complete the job. The plaintiff, C & H Electric, Inc., appeals[1] from the judgment of the trial court in part for the defendant, the town of Bethel (town), on the plaintiff's claims of breach of contract and unjust enrichment arising from the plaintiff's role in the town's renovation of its high school.[2] The trial court rejected the plaintiff's claim that the town must reimburse it for additional costs incurred during its electrical work due to interference from the town's ongoing asbestos abatement work at the school. On appeal, the plaintiff insists that the trial court: (1) applied an improper standard for determining "active interference," arguing that it needed to show only an affirmative, wilful act by the town that unreasonably interfered with the plaintiff's work, rather than bad faith or gross negligence as the trial court required; and (2) incorrectly concluded that the town's conduct did not fall within either of two judicially created exceptions to the enforcement of "no damages for delay" clauses adopted by this court in *White Oak Corp.* v. *Dept. of Transportation*, 217 Conn. 281, 289, 585 A.2d 1199 (1991) (*White Oak*).

We agree with the plaintiff that it need not show bad faith or gross negligence to establish active interference, but conclude that the town's conduct in this case did not rise to the level of active interference or fall within either of the claimed *White Oak* exceptions. We therefore agree with the trial court's decision that the plaintiff is not entitled to compensation under any of the "no damages for delay" exceptions at issue here. Accordingly, we affirm the trial court's judgment.

The record reveals the following facts, as stipulated by the parties or found by the trial court, and relevant procedural history. The town originally built the school in the 1960s and later expanded it in the 1970s. Consistent with typical construction practices of that era, the town installed significant quantities of materials that contained asbestos during those projects. The town abated some of these materials during renovations in the 1980s, but left some in place because its contractors had difficulty reaching them at that time. According to an environmental consultant later hired by the town, this was "not an uncommon condition."

Several years later, in 2004, the town decided to renovate and expand the school by updating the existing structure and building a large addition. Before beginning construction, the town hired an environmental

consultant to look for hazardous materials within the school, including asbestos. The consultant discovered some of the asbestos left behind in the existing building during the earlier renovations and recommended that the town remove it before beginning the renovation project. The town hired an abatement contractor to perform the removal work. The town expected the abatement contractor to complete its work during the summer of 2006, before the start of classes in the fall of 2006, and before any new construction, which was slated to begin in early 2007. In a July, 2006 letter to the town's Board of Selectmen, the town's school building committee chairperson explained: "[W]e are addressing [the asbestos abatement] now and not during the actual construction phase, which would have complicated our project and more than likely would have added significant costs."

For reasons not clear from the record, the abatement contractor completed just 70 percent of the abatement work during that summer before students returned for the 2006–2007 school year. The town suspended the abatement work before the start of classes, choosing instead to complete the remaining 30 percent of the work later in the year and over the following summer. In an August, 2006 letter to the town's first selectman, the town's environmental consultant explained: "The work that did not get completed this year was the removal of the locker banks and cleaning of the corridor ceilings on the first and second floors. Leaving these areas will not immediately affect the new construction work . . . ."

Although the town had yet to complete the abatement, it chose to move forward with the construction. Through its construction manager, the town initially opened the project for bidding at the end of the summer of 2006, but later asked contractors to hold their bids open for two additional months so that the town could seek additional financing for the project. The plaintiff held its bid open and, after lengthy negotiations, contracted with the town to perform the project's electrical work for a price of more than three million dollars.

The parties' contract contained a "no damages for delay" clause limiting the town's liability for any delays caused by the town. An addendum to the contract provided in relevant part: "Notwithstanding anything to the contrary in the [contract], an extension in the [time to complete the work] shall be the sole remedy of [the plaintiff] for any (1) delay in the commencement, prosecution or completion of the work, (2) hindrance or obstruction in the performance of the work, (3) loss of productivity, or (4) other similar claims whether or not such delays are foreseeable, contemplated, or uncontemplated . . . ."

The parties included a single exception to this "no damages for delay" clause, expressly excluding from

its scope any claims for "a [d]elay . . . caused by acts of the [town] constituting *active interference* with [the plaintiff's] performance of the [w]ork . . . ." (Emphasis added.) The exception explained that the town would be liable for delay damages resulting from the town's active interference only if "such acts continue after [the plaintiff] furnishes the [town] with written notice of such interference." The contract did not define the phrase "active interference" but explained that the town's "exercise of any of its rights or remedies under the [contract] (including without limitation, ordering changes in the work, or directing suspension, rescheduling or correction of the work), regardless of the extent or frequency of the [town's] exercise of such rights or remedies, shall not be construed as active interference with [the plaintiff's] performance of the work."

Before entering into the contract with the plaintiff, the town openly discussed the delay in completing the abatement work at a number of public meetings, but did not directly inform the plaintiff. As part of the bid materials, the town provided the plaintiff with drawings indicating the location of asbestos within the existing school building, but the original schedule provided to bidders indicated that abatement would be completed before any construction began. The town did not revise the project specifications to reflect that about 30 percent of the abatement work remained incomplete. The town also did not discuss the progress of the abatement during contract negotiations with the plaintiff and the plaintiff did not ask about it. Instead, the plaintiff assumed this work would be completed prior to the start of construction. According to the trial court, the plaintiff's president "did not pay a lot of attention to the bid terms" because the plaintiff previously had worked with the town's construction manager many times. In addition, the plaintiff's senior project manager "admitted that there was a risk that more asbestos might be found than was originally identified by [the] asbestos consultant," but he "never examined the [asbestos] drawings in detail to see where the asbestos [was located] because [he] did not care."

The town instructed the plaintiff to commence work in February, 2007. The work went on as planned until the summer of 2007, when the continuing asbestos abatement work interrupted the plaintiff's work. The town's abatement contractor barred access to certain areas of the school building during the abatement. This required the plaintiff to move its crews and equipment to different work areas and repeatedly return to certain work areas as the abatement proceeded. Despite these interruptions, the plaintiff completed its work just about on time, but claims it incurred extra expenses as a result.[3]

After completing its work in 2009, the plaintiff presented the town with a claim for additional compensa-

tion. After the town failed to pay on that claim, the plaintiff brought the present action alleging breach of contract and unjust enrichment. The plaintiff asserted that the town owed it more money as a result of the effect of the unfinished abatement work on the plaintiff's work during the summer of 2007. To avoid application of the "no damages for delay" clause in the contract, the plaintiff claimed, among other things, that the town knew the ongoing asbestos abatement work would interfere with construction, but nevertheless ordered the plaintiff to begin its work. In support of its claims, the plaintiff asserted that it need only prove that the town committed some affirmative, wilful act that unreasonably interfered with its work, and that the town's actions fell within this standard because the town actively concealed from the plaintiff the delay in the asbestos abatement work. In addition, the plaintiff argued that the town's concealment and failure to provide the plaintiff unfettered access to its work sites fell within exceptions to "no damages for delay" clauses articulated in *White Oak Corp.* v. *Dept. of Transportation*, supra, 217 Conn. 289.

The town disagreed, responding that the plaintiff had failed to prove that the town's conduct fell within any exception to the contract's "no damages for delay" clause. According to the town, the active interference exception required the plaintiff to show bad faith, wilful, malicious, or grossly negligent conduct by the town, and its conduct did not reach this level. As for the plaintiff's claim of concealment, the town noted that it regularly discussed the progress of the asbestos abatement openly in public meetings, and that its retention of asbestos contractors was public information. Furthermore, the town maintained that other contractors, not the town, were responsible for any delay from the remaining abatement work, and that the town was not aware that the remaining abatement work would interfere with construction.

After a court trial with some testimony from the plaintiff's witnesses and many stipulated facts, the trial court found in favor of the town on the plaintiff's active interference and *White Oak* claims. In its memorandum of decision, the trial court concluded that the active interference exception to the "no damages for delay" clause required a showing of bad faith, malicious intent, or gross negligence, equating this exception with the bad faith exception articulated in *White Oak*. Id., 289. Applying this standard, the trial court concluded that the town did not actively interfere with the plaintiff's work and that the delay in the abatement work was caused by the town's contractors, not the town. The court found that the town did not conceal the unfinished abatement work because it openly discussed the issue at public meetings that the plaintiff could have attended, but did not. The trial court also determined that any alleged concealment by the town did not harm the plain-

tiff because the plaintiff's representatives testified that they did not pay close attention to the supposedly inaccurate contract documents and, in any event, the plaintiff completed its work on time.[4] The trial court then rendered judgment for the town in part. See footnote 2 of this opinion. This appeal followed.

On appeal, the plaintiff claims that the trial court improperly concluded that the town's conduct did not meet: (1) the active interference exception to the contract's "no damages for delay" clause; and (2) the exceptions to "no damages for delay" clauses for bad faith or breach of a fundamental contractual obligation as set forth in *White Oak Corp.* v. *Dept. of Transportation*, supra, 217 Conn. 289. We address each claim in turn.

## I

### ACTIVE INTERFERENCE

The plaintiff first claims that the trial court improperly concluded that the town's conduct did not satisfy the contract's active interference exception. The plaintiff relies on recent case law from other jurisdictions and argues that the trial court improperly concluded that the active interference exception required proof of bad faith or gross negligence.[5] Instead, the plaintiff posits that the plain meaning of the phrase "active interference" does not connote wrongdoing, but only that the owner must engage in some affirmative, wilful act that unreasonably interferes with the contractor. The plaintiff directs us to the trend in cases from other jurisdictions that support its interpretation. Using this standard, the plaintiff maintains on appeal, as it did at trial, that the town's decision to order the plaintiff to commence work, despite its knowledge that the remaining asbestos work would interfere with construction, amounted to active interference. Alternatively, the plaintiff claims that the town actively interfered by failing properly to coordinate its contractors, leaving the asbestos work to interfere with the plaintiff's work.

The town disagrees, asserting, in response, that the trial court's conclusions about the standard of conduct required to prove active interference, along with its application of that standard to the facts of the present case, were legally correct. More specifically, the town relies on cases from other jurisdictions and argues that courts have interpreted "active interference," as used in this context, to require a showing of bad faith, and that the drafter of the contract at issue here intended for that definition to apply.[6] According to the town, the cases cited by the plaintiff are a minority position, generally adopted by jurisdictions that recognize both a "bad faith" and an "active interference" exception to "no damages for delay" clauses in construction contracts. Here, the town explains, Connecticut has no separate, judicially created active interference exception, so the trial court properly determined active inter-

ference exception in the contract to be synonymous with the "bad faith" exception that we adopted in *White Oak Corp.* v. *Dept. of Transportation*, supra, 217 Conn. 289–90, which requires a showing of "bad faith, wilful, malicious, or grossly negligent conduct." In any event, the town maintains that the plaintiff failed to meet its burden under either standard.

We conclude that the trial court properly determined that the town did not actively interfere with the plaintiff's work. First, we agree with the plaintiff that "active interference," as used in the contract, does not require a showing of bad faith or gross negligence, but, instead, only that the town committed some affirmative, wilful act that unreasonably interfered with the plaintiff's work. Second, because the record shows that no evidence was presented that the town's representatives actually knew that the unfinished abatement work would interfere with the plaintiff's work, we conclude that the town's alleged interference was neither wilful nor unreasonable.

A

Active Interference Standard

We turn first to the meaning of "active interference" as used in the parties' contract. We have previously established the principles employed by this court when determining the meaning of contract language. See, e.g., *Murtha* v. *Hartford*, 303 Conn. 1, 7–8, 35 A.3d 177 (2011). We need not repeat our prior recitations of those principles here, in full. It suffices to say that we first attempt to ascertain the parties' intent from the language they used in their contract, looking at the contract as a whole and giving the contract's words their ordinary meaning and one that renders its provisions consistent. Id. Only if the language in the contract is truly capable of more than one reasonable interpretation will we look to evidence beyond the contract language for guidance as to what the parties intended. Id. Interpretation of unambiguous contract language presents a question of law. *FCM Group, Inc.* v. *Miller*, 300 Conn. 774, 811, 17 A.3d 40 (2011). We review the trial court's conclusions based on any stipulated fact as a question of law, but defer to any findings of nonstipulated or disputed facts unless those findings are clearly erroneous. Compare *418 Meadow Street Associates, LLC* v. *Clean Air Partners, LLC*, 304 Conn. 820, 829–30, 43 A.3d 607 (2012), with *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 219 Conn. 51, 62, 591 A.2d 1231 (1991).

Our analysis begins with the contract language. The parties' contract contains provisions prohibiting the plaintiff from seeking damages for any delays caused by the town. These so-called "no damage for delay" clauses frequently appear in construction contracts. Their purpose is to shield property owners from claims by contractors for money damages when delays occur

on the job, leaving contractors the sole remedy of seeking an extension of time to complete their work. These clauses are generally enforceable subject to certain judicially created exceptions. See *FCM Group, Inc.* v. *Miller*, supra, 300 Conn. 812–13; *White Oak Corp.* v. *Dept. of Transportation*, supra, 217 Conn. 289.

In *White Oak*, we adopted four common-law exceptions to enforcement of these clauses, permitting contractors to seek damages for: "(1) delays caused by the [owner's] bad faith or its [wilful], malicious, or grossly negligent conduct, (2) uncontemplated delays, (3) delays so unreasonable that they constitute an intentional abandonment of the contract by the [owner], and (4) delays resulting from the [owner's] breach of a fundamental obligation of the contract." (Internal quotation marks omitted.) *White Oak Corp.* v. *Dept. of Transportation*, supra, 217 Conn. 289, quoting *Corrino Civetta Construction Corp.* v. *New York*, 67 N.Y.2d 297, 309, 493 N.E.2d 905, 502 N.Y.S.2d 681 (1986). These exceptions are rooted in the duty of good faith and fair dealing implied in every contract and are intended to avoid the otherwise draconian results that might flow from strict enforcement—namely, excusing the owner for harm to the contractor caused by the owner's egregious and unfair conduct. See, e.g., *Kalisch-Jarcho, Inc.* v. *New York*, 58 N.Y.2d 377, 384–85, 448 N.E.2d 413, 461 N.Y.S.2d 746 (1983); *United States ex rel. Williams Electric Co.* v. *Metric Constructors, Inc.*, 325 S.C. 129, 133–34, 480 S.E.2d 447 (1997); cf. *White Oak Corp.* v. *Dept. of Transportation*, supra, 289.

Apart from the *White Oak* exceptions, the parties' contract here included a single, express exception permitting the plaintiff to seek damages caused by a delay in the construction, if that "[d]elay is caused by acts of [the town], constituting active interference with [the plaintiff's] performance of the [w]ork . . . ." The parties did not define what they meant by "active interference," but did carve out certain conduct from its meaning. According to the contract, "the [town's] exercise of any of its rights or remedies under the [contract] [d]ocuments (including without limitation, ordering changes in the work, or directing suspension, rescheduling or correction of the work), regardless of the extent or frequency of the [town's] exercise of such rights or remedies, shall not be construed as active interference with [the plaintiff's] performance of the work."

As an initial matter, the parties disagree over whether the phrase "active interference" is ambiguous. The plaintiff claims that the meaning is clear, especially in light of more recent case law from other jurisdictions. The town, on the other hand, argues that "active interference" is ambiguous because other jurisdictions have given that phrase two different meanings: one requiring bad faith or malicious conduct, the other requiring only an affirmative wilful act by the owner that unreasonably

interferes with the contractor. See, e.g., *Pellerin Construction, Inc.* v. *Witco Corp.*, 169 F. Supp. 2d 568, 583 (E.D. La. 2001) (noting that active interference exception "has not attained any precise judicial description"). We agree that this phrase is reasonably susceptible to more than one reasonable interpretation, but the parties have presented no helpful extratextual evidence of its meaning. The only extratextual evidence in the record, as noted by the trial court, is a stipulation that the drafter of the contract intended the active interference exception to circumvent the exceptions to "no damages for delay" clauses in *White Oak Corp.* v. *Dept. of Transportation*, supra, 217 Conn. 289. The parties have not, however, provided any other extratextual evidence of what the drafter intended "active interference" to mean beyond the decisions of other courts about the meaning of that phrase. As a result, we are left with the language of the contract and those judicial interpretations to guide our inquiry.

Many, if not most, other states recognize a separate, judicially created active interference exception to "no damages for delay" clauses. Those courts have, however, struggled to identify a precise definition of "active interference." *Pellerin Construction, Inc.* v. *Witco Corp.*, supra, 169 F. Supp. 2d 583. The cases are generally split between those concluding, on the one hand, that active interference requires proof of some bad faith or malicious intent by the owner, and, on the other hand, those requiring only that the owner commit some affirmative, wilful act that unreasonably interferes with the contractor's work. Compare *Peter Kiewit Sons' Co.* v. *Iowa Southern Utilities Co.*, 355 F. Supp. 376, 399 (S.D. Iowa 1973) (articulating bad faith standard), with *Tricon Kent Co.* v. *Lafarge North America, Inc.*, 186 P.3d 155, 160–62 (Colo. App. 2008) (bad faith not required).

The leading case articulating the bad faith standard was decided in 1973. See *Peter Kiewit Sons' Co.* v. *Iowa Southern Utilities Co.*, supra, 355 F. Supp. 399. Since then, some courts have applied the bad faith exception expressed in *Peter Kiewit Sons' Co.* See, e.g., *United States Steel Corp.* v. *Missouri Pacific Railroad Co.*, 668 F.2d 435, 438–39 (8th Cir. 1982); *P.T. & L. Construction Co.* v. *Dept. of Transportation*, 108 N.J. 539, 564, 531 A.2d 1330 (1987).

More recently, however, courts recognizing the active interference exception to "no damages for delay" clauses have not required proof of bad faith or malicious intent, but have instead required only an affirmative, wilful act by an owner. See, e.g., *Tricon Kent Co.* v. *Lafarge North America, Inc.*, supra, 186 P.3d 159–61; *Kalisch-Jarcho, Inc.* v. *New York*, supra, 58 N.Y.2d 384–85; *United States ex rel. Williams Electric Co.* v. *Metric Constructors, Inc.*, supra, 325 S.C. 134. Courts adopting the latter, more recent standard typically

already recognize a separate "bad faith" exception distinct from the notion of "active interference," and, thus, decline to give the active interference exception a redundant meaning. *Tricon Kent Co.* v. *Lafarge North America, Inc.*, supra, 159–61. Some of those courts also have explained that a wilfulness standard, rather than a bad faith standard, is more consistent with the common meaning of the word "active" as used to modify "interference." See, e.g., *Kalisch-Jarcho, Inc.* v. *New York*, supra, 386 (noting that distinction between "active" and "passive" conduct "does not determine wrongdoing" and that "interference" does not "connote [wilfulness], maliciousness, abandonment, bad faith or other theories through which runs the common thread of intent" [footnote omitted; internal quotation marks omitted]).

Returning to the language of the contract at issue, and with these interpretations in mind, we reach two conclusions regarding the meaning of "active interference" as used by the parties in this case.[7] First, we agree with the plaintiff that the common understanding of the word "active," as used to modify "interference," does not suggest bad faith or malicious intent, but, rather, something done wilfully or with purpose, as opposed to passively or mistakenly. See Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) (defining "active" as meaning, among other things, "engaged in action or activity" and "characterized by action rather than by contemplation or speculation"). But we also conclude, as have virtually all other courts to consider the matter, that the phrase "active interference" demands something greater than ordinary negligence or passive omission, that is, conduct more affirmative and wilful than "a simple mistake, error in judgment, lack of total effort, or lack of complete diligence." *Tricon Kent Co.* v. *Lafarge North America, Inc.*, supra, 186 P.3d 161–62, citing *Peter Kiewit Sons' Co.* v. *Iowa Southern Utilities Co.*, supra, 355 F. Supp. 399; see also *Thomas & Associates, Inc.* v. *Metropolitan Government of Nashville*, Docket No. M2001-00757-COA-R3-CV, 2003 WL 21302974, *16 (Tenn. App. June 6, 2003); *United States ex rel. Williams Electric Co.* v. *Metric Constructors, Inc.*, supra, 325 S.C. 134.

Second, because the clause at issue in this case expressly excluded from the definition of active interference any exercise of the town's rights under the contract, the conduct giving rise to the delay and the delay itself also must be truly unreasonable to expose the town to liability. Ordinary construction delays—especially those reasonably foreseen by the parties at the time of contracting—will not amount to active interference. Rather, the plaintiff accepted the risk that these types of delays might occur when it signed the contract. See, e.g., *P.T. & L. Construction Co.* v. *New Jersey Dept. of Transportation,* supra, 108 N.J. 564 ("This is precisely the latitude that the [owner] bargains for in its multiple contracts, namely, that it shall not be liable

for the cross-delays occasioned by the various contracting efforts. Nor shall it expose itself to inquiries into the reasonableness of every delay."); *Gherardi* v. *Board of Education*, 53 N.J. Super. 349, 365, 147 A.2d 535 (1958) (Delays from claimed interference "were nothing more than the ordinary and usual types of delay with which most contractors are frequently confronted. They are part of the risks and uncertainties [the contractor] impliedly accepts in signing such an agreement."); *Gasparini Excavating Co.* v. *Pennsylvania Turnpike Commission*, 409 Pa. 465, 474, 187 A.2d 157 (1963) (party cannot seek damages when alleged delay was foreseeable); *Thomas & Associates, Inc.* v. *Metropolitan Government of Nashville*, supra, 2003 WL 21302974, *14 ("When . . . contracts contain 'no damages for delay' clauses, bidding contractors remain free to formulate and submit bids that account for the possibility of delay . . . . Contractors can also elect not to bid on such contracts, if they, as a business matter, do not want to assume that risk of loss.").

The town urges us to interpret active interference, as used in the contract, to require bad faith or gross negligence. In support of this argument, the town claims that the trial court's decision regarding the proper meaning of "active interference" was a finding of fact about the drafter's intent, and thus may be assailed only if clearly erroneous. Even though the parties did not present evidence of what the drafter intended "active interference" to mean, the town's brief is replete with speculation about what the drafter might have intended. For example, the town claims that: "the draftsman's goal was to afford maximum protection to the [o]wner without offending public policy"; "the draftsman was looking to the common law for an exception for his ['no damages for delay'] clause—one that would be difficult to invoke, but whose presence would eliminate any public policy challenge"; "he never would have chosen a level of conduct that fails to reach the level needed for an exception under New York law"; and, in the heightened "bad faith" or "gross negligence" standard, "[h]e found what he wanted . . . ." The only evidence in the record about the drafter's intent, as noted by the trial court, is the single stipulation by the parties that the drafter intended to circumvent the *White Oak* exceptions. The trial court made no additional findings regarding the drafter's intent.

We decline the town's invitation to guess what the drafter might have intended "active interference" to mean on the basis of a single stipulated fact. According to the trial court's decision, the parties stipulated that "the 'no damages for delay' clause was an attempt by the drafter of the contract . . . to circumvent the *White Oak* exceptions."[8] The record contains no evidence that the drafter objectively manifested or explained to the other party what he intended "active interference" to mean. Without such evidence, the draft-

er's subjective intentions have no bearing on our decision. See *Hydro-Hercules Corp.* v. *Gary Excavating, Inc.*, 166 Conn. 647, 652, 353 A.2d 714 (1974) ("[t]he intention of the parties manifested by their words and acts is essential to determine whether a contract was entered into and what its terms were" [internal quotation marks omitted]).

We therefore conclude that to establish active interference, the plaintiff must prove that the town committed an affirmative, wilful act that unreasonably interfered with the plaintiff's work and that this act must be more than a mistake, error in judgment, lack of total effort, or lack of diligence.

B

Application of Active Interference Standard

The plaintiff advances two separate bases for its active interference claim: (1) the town concealed the remaining asbestos abatement from the plaintiff and ordered the plaintiff to begin its work, despite knowing that the abatement would cause the plaintiff delays and lost productivity; and (2) the town's coordination of its contractors and failure to update the project specifications interfered with the plaintiff's ability to complete its work. We address each claim in turn.

As for its first claim, the plaintiff suggests, with strong supporting authority, that the town's directive to the plaintiff to proceed with its work, despite knowledge of delay causing conditions—namely, the ongoing asbestos abatement—and its concealment of these conditions, satisfies the active interference exception. See, e.g., *Dennis Stubbs Plumbing, Inc.* v. *Travelers Casualty & Surety Co. of America*, 67 Fed. Appx. 789, 792 (4th Cir. 2003) (noting that owner's order to contractor to proceed at site not ready for contractor's work "historically [has] been the gravamen of triable active interference claims"); *United States Steel Corp.* v. *Missouri Pacific Railroad Co.*, supra, 668 F.2d 439 (issuance of notice to proceed and "proof of the [owner's] knowledge that delay-causing circumstances exist which will likely prevent the contractor from timely proceeding with its work" is sufficient to establish active interference); see also *American Bridge Co.* v. *New York*, 245 App. Div. 535, 539–40, 283 N.Y.S. 577 (1935) (owner actively interfered with contractor when it required contractor to fabricate steel prematurely, requiring contractor to incur storage and repainting expenses). We agree that this type of conduct would meet the contract exception, but we disagree that the town's conduct reached that level here.

In those cases finding active interference when an owner directs a contractor to begin work despite delay causing conditions, there was evidence that the owner actually knew that the contractor's work would be delayed. See, e.g., *Dennis Stubbs Plumbing, Inc.* v.

*Travelers Casualty & Surety Co. of America*, supra, 67 Fed. Appx. 792 (owner ordered plumber to begin work in areas not ready for plumbing); *United States Steel Corp.* v. *Missouri Pacific Railroad Co.*, supra, 668 F.2d 438–39 (proof of owner's knowledge of delay causing condition establishes active interference); *American Bridge Co.* v. *New York*, supra, 245 App. Div. 538–40 (finding active interference when owner ordered contractor to manufacture steel prematurely for project when it was "obvious" that project was not ready for steel installation); *Gasparini Excavating Co.* v. *Pennsylvania Turnpike Commission*, supra, 409 Pa. 474 (finding active interference when owner knew of delay causing condition and "in face of this knowledge ordered [contractor] to start operations"). In each of these cases, it was the owner's knowledge that the contractor would encounter delays that made its interference sufficiently affirmative and wilful to avoid application of the "no damages for delay" clause. Proof of this awareness when the order is issued is vital.[9]

Turning to this case, we disagree with the plaintiff that it proved that the town was actually aware—when it issued the notice to proceed—that the remaining asbestos abatement would disrupt the plaintiff's work. Although the plaintiff presented this argument to the trial court, that court did not make any finding that the town was actually aware that the plaintiff's work would likely be disrupted. Nor did the parties stipulate to this fact. Nevertheless, to demonstrate the town's actual awareness of delay causing conditions, the plaintiff cites to a single letter to the town from the town's building committee chairman. That letter explains that, by undertaking the abatement at the school before starting construction, the town avoided potential complications with the construction work. This plan was, however, precautionary. After the date of this letter the town completed about 70 percent of the abatement work before beginning construction, leaving only about 30 percent of the abatement to complete during construction. Nothing in the record suggests that the town's representatives knew that completing the remaining abatement work during construction would disrupt the plaintiff's work.

Indeed, the record suggests that the town's representatives believed that the town had completed enough abatement work to begin construction. A letter sent to the town by its environmental consultant explains that leaving certain areas for abatement during construction "will not immediately affect the new construction work . . . ." Based on this, it would have been reasonable for the town to conclude that directing the plaintiff to proceed during the remaining abatement work would not have unreasonably interfered with the plaintiff's own work. The plaintiff was able to begin and initially focus its work on the new addition, which, having yet to be built, did not contain any asbestos and, thus,

needed no abatement. That the town's decision, supported by an environmental consultant, later proved to be erroneous does not transform the town's mistake or error in judgment into active interference. In the absence of a finding by the trial court and sufficient evidence of knowledge, we decline to conclude, on appeal, that the town knew the unfinished abatement would disrupt the plaintiff's work when it instructed the plaintiff to proceed.

Second, we disagree that the town actively attempted to conceal the delay in the remaining asbestos work from the plaintiff. The record shows that the town did not disclose this fact directly to the plaintiff. The town did, however, repeatedly discuss the delay openly in public meetings. Although we do not suggest that the plaintiff has a duty to attend all public meetings of the town or else be charged with notice, the town's readiness to discuss the delay publicly undermines the argument that the town actively concealed it. Rather, it appears from the record that the town's failure to disclose the delay to the plaintiff was an oversight or that the town's representatives thought, as its environmental consultant suggested, that the remaining asbestos work would not interfere with the plaintiff's work and, thus, was not necessary to disclose. Either way, the record does not support a finding of active concealment by the town. Interference as a result of a mistake or an oversight is not enough to satisfy the active interference exception in the contract. This is particularly so when the alleged interference was caused by a delay that the parties contemplated. The parties expressly agreed that delays caused by the failure of another contractor to perform its work were "clearly contemplated by the parties" at the time of contracting.

The plaintiff next claims that the town actively interfered with its ability to schedule and plan its work by failing to coordinate the work of the contractors properly and by not updating the project specifications to show the location of additional asbestos and the timing of the abatement. We disagree for three reasons.

First, the parties did not make any stipulations about the manner in which the town coordinated its contractors. Nor did the trial court make any findings that the town's coordination of its contractors interfered with the plaintiff's work. In the absence of such stipulations or findings, we decline to conclude, on appeal, that the town's coordination of its contractors was improper or that the town wilfully interfered with the plaintiff's work in this regard.

Second, the contract expressly excludes from the definition of active interference any exercise by the town of its right to coordinate the work under the contract, including "ordering changes in the work, or directing suspension, rescheduling or correction of the work . . . ." Coordinating contractors in a manner that

requires the plaintiff to work in different locations within the school to accommodate the ongoing asbestos abatement is merely an exercise by the town of its right to reschedule or suspend work. Whether the town exercised these rights to the plaintiff's satisfaction is irrelevant under the contract. The parties categorically excluded from the meaning of "active interference" any rescheduling or suspension of work by the town, irrespective of the extent and frequency that the town exercised these rights. It is not this court's place to rewrite the parties' contract in these circumstances, especially when the parties are sophisticated commercial and governmental entities. As found by the trial court, the plaintiff had "considerable experience" working on public school projects and "[t]he fact that delays for asbestos removal could arise on such a project, particularly given the age of the building, should not surprise a sophisticated commercial entity such as the plaintiff."

The parties fully anticipated that additional asbestos might be found as the project unfolded and that abatement could impact the project. According to the trial court, the plaintiff's senior project manager "admitted that there was a risk that more asbestos might be found than was originally identified by an asbestos consultant."[10] The contract here specifically provided that the parties foresaw that delays might be caused by other contractors. At trial, the plaintiff's president testified that he accepted "the risks that [the 'no damages for delay' clause] imposes and allocates." These risks expressly included the potential that the town might reschedule or suspend work as a result of delays caused by other contractors. See *Taylor-Fichter Steel Construction Co.* v. *Niagara Frontier Bridge Commission*, 261 App. Div. 288, 294–95, 25 N.Y.S.2d 437 (1941) (rejecting active interference claim based on delays caused by other contractors because these delays are "circumstances which all contractors are required to face"); *Gasparini Excavating Co.* v. *Pennsylvania Turnpike Commission*, supra, 409 Pa. 475 ("[w]here contracts contain a provision against delay of other contractors or other incidents of the work, which provide in substance as this one does for no liability on the part of the owner for delays of contractors or changes in the work, such provision includes delays of other contractors in connection with the work, or delays which are covered by the contract or reasonably anticipated from the circumstances attending the project" [internal quotation marks omitted]).

Third, the trial court found that the problems resulting from rescheduling and failing to disclose the unfinished abatement work did not unreasonably interfere with the plaintiff's work. Specifically, the trial court found that the ongoing abatement work "was not that which ultimately impacted this job." Rather, "the [unfinished abatement work] was performed in 2007 during [a] period when the plaintiff was . . . the most produc-

tive." Furthermore, the trial court found that the job "[i]ndisputably was finished on time." The plaintiff has not challenged these findings as clearly erroneous. We see no reason to disturb those findings and, accordingly, conclude that the town's less than fastidious coordination of the contractors and handling of the project specifications did not actively interfere with the plaintiff's work.[11] Consequently, we conclude that the trial court properly determined that the plaintiff did not prove its active interference claims.[12]

## II

### *WHITE OAK* EXCEPTIONS

The plaintiff also claims on appeal that it may obtain damages from the town under two common-law exceptions to the enforcement of "no damages for delay" clauses set forth in *White Oak Corp.* v. *Dept. of Transportation*, supra, 217 Conn. 289. In *White Oak*, following New York law, we adopted four exceptions to enforcement of these clauses, permitting contractors to seek damages for: "(1) delays caused by the [owner's] bad faith or its [wilful], malicious, or grossly negligent conduct, (2) uncontemplated delays, (3) delays so unreasonable that they constitute an intentional abandonment of the contract by the [owner], and (4) delays resulting from the [owner's] breach of a fundamental obligation of the contract." (Internal quotation marks omitted.) Id., quoting *Corrino Civetta Construction Corp.* v. *New York*, supra, 67 N.Y.2d 309. The plaintiff's claims are based on the first *White Oak* exception for bad faith or gross negligence and the fourth *White Oak* exception for breach of a fundamental obligation. We address each in turn.

### A

### Bad Faith

As for the first exception, the plaintiff's claim is familiar and is based on its allegations that the town concealed delay causing conditions from the plaintiff and nevertheless ordered it to begin work despite knowledge of these conditions. The plaintiff argues that this conduct meets the bad faith and gross negligence exception in *White Oak*. We disagree.

The town's conduct did not amount to active interference and, therefore, cannot rise to the level of bad faith or negligence. Proof of bad faith requires misconduct that "smacks of intentional wrongdoing," including fraudulent or malicious behavior. *Kalisch-Jarcho, Inc.* v. *New York*, supra, 58 N.Y.2d 385. Gross negligence requires conduct that "betokens a reckless indifference to the rights of others . . . ." Id. Active interference, on the other hand, requires a lesser showing. See id., 386 (noting that, to find bad faith or gross negligence, "the jury would have to find more than 'active interference' "). We have already determined in part I A of this opinion that the town did not actively conceal the

unfinished abatement work and that the plaintiff did not prove that the town was aware that the remaining abatement work would interfere with the plaintiff's own work. Having failed to establish that the town actively interfered, the plaintiff necessarily has not demonstrated that the town acted in bad faith or with gross negligence. Accordingly, we conclude that the trial court properly rejected the plaintiff's claim under this exception.

## B

### Breach of Fundamental Obligation

Turning to the fourth exception, the plaintiff argues that the town breached its fundamental obligations in two ways: (1) by failing to disclose and update specifications to reflect the remaining asbestos work; and (2) by not providing the plaintiff with site access to complete its work. We disagree.

To establish this exception, a contractor must prove that an owner violated a truly fundamental contract provision—courts have made clear that ordinary breaches are not enough. "A[n] [owner's] breach of contract is also recognized as an exception to the enforceability of exculpatory clauses but . . . the exception is applied to an especially narrow range of circumstances. Because the exculpatory clause is specifically designed to protect the [owner] from claims for delay damages resulting from its failure of performance in the ordinary, garden variety ways, delay damages may be recovered in a breach of contract action only for the breach of a fundamental, affirmative obligation the agreement expressly imposes on the [owner]. Typical of such claims are those in which the [owner] has failed in its obligation to obtain title to the work site or make it available to the contractor so that it may commence construction of the agreed upon improvements . . . ." (Citations omitted.) *Corrino Civetta Construction Corp.* v. *New York*, supra, 67 N.Y.2d 313.

We conclude that the plaintiff did not prove a fundamental breach under either of its theories. The trial court determined that the town's supposed missteps had no meaningful impact on the plaintiff's work and, therefore, did not rise to the level of a fundamental breach. As for the plaintiff's claim about site access, the trial court found that the town did not prevent the plaintiff from accessing the work site; rather, the town asked the plaintiff to move its operations on that site to accommodate the ongoing abatement. The trial court concluded that, despite these accommodations, "the job was finished within the original time parameters" for the project. Although the plaintiff may not have had access to the specific areas of the job site when it wanted, it had sufficient access to the job site to complete the project on time. Furthermore, the trial court rejected the plaintiff's claim of a lack of disclosure

stemming from the town's failure to update its plans for many of the same reasons, finding that the plaintiff paid little attention to the specifications showing the location of asbestos and the unfinished asbestos work had little impact on the plaintiff's productivity. The trial court determined that the unfinished asbestos work that the town failed to disclose "was not that which ultimately impacted this job," that the plaintiff was "most productive" during the period at issue, and that the job "[i]ndisputedly was finished on time." The plaintiff may disagree with these findings, but it has not challenged them as clearly erroneous. We, therefore, decline to disturb the trial court's conclusion that the plaintiff did not meet its burden of proving that the town breached a fundamental obligation.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] The trial court found in favor of the plaintiff on certain of its other contract claims regarding the contract rates and rendered judgment for the plaintiff on those claims, which are not at issue in this appeal.

[3] The plaintiff was also interrupted by problems with previously undiscovered asbestos and other conditions in late 2007 and 2008, but these delays are not at issue in this appeal.

[4] The trial court also noted that the plaintiff made its anticipated profit.

[5] The plaintiff cites to several cases holding that active interference does not require a finding of bad faith. See, e.g., *Tricon Kent Co.* v. *Lafarge North America, Inc.*, 186 P.3d 155, 160–62 (Colo. App. 2008); *Kalisch-Jarcho, Inc.* v. *New York*, 58 N.Y.2d 377, 384–85, 448 N.E.2d 413, 461 N.Y.S.2d 746 (1983); *United States ex rel. Williams Electric Co.* v. *Metric Constructors, Inc.*, 325 S.C. 129, 133–34, 480 S.E.2d 447 (1997).

[6] In support of its claims, the town principally relies on a leading case, *Peter Kiewit Sons' Co.* v. *Iowa Southern Utilities Co.*, 355 F. Supp. 376, 399 (S.D. Iowa 1973), which concluded that "active interference" requires a showing of bad faith by the owner, and other cases following the *Peter Kiewit Sons' Co.* standard. See, e.g., *United States Steel Corp.* v. *Missouri Pacific Railroad Co.*, 668 F.2d 435, 438–39 (8th Cir. 1982).

[7] Because the contract at issue here expressly contains an active interference exception, we are not called on to consider adopting a common-law active interference exception to the enforcement of a "no damages for delay" clause, either independently or as part of the established *White Oak* exceptions. We thus express no opinion on that issue.

[8] The "no damages for delay" clause was drafted by an attorney for the town's construction manager, O & G Industries, Inc. (O & G). The parties stipulated that: "As construction manager . . . O & G was expected to enter into the contracts with the various trade contractors expected to perform the work." But before the construction began, the town dismissed O & G and, instead, contracted directly with the plaintiff.

The limited information in the record about the drafting of the contract further prevents us from drawing any meaningful inferences of the parties' intent concerning the subject contract provision because O & G did not ultimately execute the contract with the plaintiff. There is no evidence in the record about what the town's representatives thought "active interference" meant or that O & G's attorney manifested his understanding to the town or to the plaintiff.

[9] At least one court has held that conduct of this nature rises to the level of bad faith. See *United States Steel Corp.* v. *Missouri Pacific Railroad Co.*, supra, 668 F.2d 438–39. Regardless of whether active interference requires bad faith or not, it is clear from the foregoing cases that courts require actual knowledge on the part of the owner to establish the wilfulness of the alleged interference.

[10] Although the plaintiff claims that it did not expect a disruption to the extent it experienced, both its president and senior project manager testified

that they did not pay close attention to the specifications and drawings showing the known location of asbestos. Nor did the plaintiff attempt to quantify the amount of asbestos within the school to gain a better understanding of the potential impact that the presence of asbestos might have on the project.

[11] It appears from the record and briefs that the plaintiff's claims of active interference before the trial court were principally based on *other* delays caused by asbestos related problems and other issues that arose *after* the abatement contractor completed the unfinished work left over from the previous summer. For example, later in the construction project, the town discovered additional asbestos that required abatement, slowing the project's progress. In addition, the town suspended the project for a few weeks as a result of an uncontained release of asbestos into the school. Certainly, the presence of asbestos at the school presented a problem for the town and affected the contractors on the job. But whether those *other* asbestos related delays and problems are compensable under the contract is not a question before us in this appeal. We conclude only that the evidence does not support a conclusion that the town's decision to commence construction despite the unfinished abatement work, and the town's failure to fully disclose this work to the plaintiff, amounts to active interference.

[12] The trial court also rejected the plaintiff's active interference claim because the plaintiff did not provide sufficient notice of a claim for active interference, a prerequisite to filing a claim under the contract's active interference exception. Our own analysis of the record supports this conclusion. Nevertheless, because we conclude that the plaintiff's claims do not succeed on their merits, we do not consider whether the plaintiff's claims are barred by a failure to provide notice.

We do not suggest, by reaching the merits of the plaintiff's appeal, that contract notice requirements are not important. Notice provisions serve an important role in defining the relationship between the owner and contractor. Their stated procedures are not mere bureaucratic red tape. Notice provisions give the owner an opportunity to investigate the extent and accuracy of any claims by the contractor before the contractor spends extra money to address the problem. *Cecio Bros., Inc.* v. *Greenwich*, 156 Conn. 561, 568, 244 A.2d 404 (1968). Equally as important, these requirements allow the owner to reduce or eliminate any extra costs by addressing the problem before the contractor incurs these costs. Id. This is a critical tool for municipalities to keep their public projects within their budgets. Id. Indeed, we explained in *Cecio Bros., Inc.*, that if courts do not enforce notice requirements, "it is difficult to see how a municipality could ever protect itself from a contractor's unanticipated and long-delayed claim for compensation . . . in excess of the public funds appropriated for a construction project." Id., 569. As a result of these concerns, a lack of notice can defeat an otherwise meritorious claim by a contractor. See, e.g., id., 568; see also *Marriott Corp.* v. *Dasta Construction Co.*, 26 F.3d 1057, 1068–70 (11th Cir. 1994) (refusing to consider active interference claim when contractor did not comply with requirement that it first request extension of time as prerequisite to filing damage claim); *Port Chester Electric Construction Corp.* v. *HBE Corp.*, 978 F.2d 820, 822–23 (2d Cir. 1992) (failure to comply with contract notice requirements for filing of claim will bar claim for active interference). Here, however, we do not need to consider whether the plaintiff gave adequate notice because, even if it did, we are not persuaded by its claims.

———————————————————